ORIGINAL

James H. Fosbinder #7070
IVEY FOSBINDER FOSBINDER LLLC
A LIMITED LIABILITY LAW COMPANY
1883 Mill Street
Wailuku, Hawaii  96793
Telephone: (808)242-4956
Facsimile: (808)249-0668
Email: jfosbinder@iff-law.com

Attorneys for Plaintiffs
TIMOTHY J. FITZGERALD and VIRGINIA PARSONS

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

MAR 28 2011

at _3_ o'clock and _15_ min. P.M. Jr
SUE BEITIA, CLERK

## UNITED STATES DISTRICT COURT
## DISTRICT OF HAWAII

| | |
|---|---|
| TIMOTHY J. FITZGERALD and VIRGINIA PARSONS,<br><br>                    Plaintiffs,<br><br>v.<br><br>AMERICAN SAVINGS BANK, F.S.B.,; MERSCORP, INC.; MORTGAGE ELECTRONIC REGISTRATION SYSTEMS; MARC IOANE, ASSISTANT VP PRESIDENT OF AMERICAN SAVINGS BANK, FSB AND CERTIFYING OFFICER OF MERS; SUSAN TILDEN LAU, SR. VP PRESIDENT OF AMERICAN SAVINGS BANK, FSB AND CERTIFYING OFFICER OF MERS; AND DOES 1 THROUGH 20 INCLUSIVE,<br>                    Defendants. | Civil No. **CV11  00199 DAE  RLP**<br><br>COMPLAINT; DEMAND FOR JURY TRIAL; EXHIBIT "1" - "10"; SUMMONS |

## COMPLAINT

Plaintiff TIMOTHY J. FITZGERALD and VIRGINIA PARSONS

(hereinafter "Plaintiffs"), by and through their attorney, JAMES

H. FOSBINDER, of IVEY, FOSBINDER, FOSBINDER LLLC, a limited

liability law company, bring the following Complaint and allege

and aver as follows:

1

## JURISDICTION AND VENUE

1.    Jurisdiction arises under 28 U.S.C. § 1331 (Federal Question Jurisdiction); the Sherman Anti-Trust Act, 15 U.S.C. § 2; the Federal Truth in Lending Act (TILA), 15 U.S.C. § 1601, et.seq., and the Act's corresponding Regulation Z (12 C.F.R. Part 226).

2.    Jurisdiction also arises under 28 U.S.C. § 1332 (Diversity Jurisdiction) and with claims exceeding $75,000.

3.    This Court has supplemental jurisdiction over this action under 28 U.S.C. § 1367(a) because state law claims are so related to the federal claims that they form part of the same case or controversy. These claims all arise out of the same controversy and sequence of events. This Court has jurisdiction over state claims asserted under Hawaii Revised Statutes (hereinafter "HRS") by virtue of pendent jurisdiction.

4.    Venue is proper in the United States District Court for the District of Hawaii, pursuant to 28 U.S.C. § 1391, in that Defendants systematically conduct and transact substantial business in this State and District as licensed banks and corporations organized and/or operating in the State of Hawaii, the causes of action occurred in this District, and Plaintiffs reside in this District.

PARTIES

**Plaintiffs**

5.     Plaintiff TIMOTHY J. FITZGERALD ("Fitzgerald") is, and at all relevant times was, over the age of eighteen and resides at 2276 W. Vineyard Street, Wailuku, HI, in the County of Maui, State of Hawaii (TMK (2) 3-4-016-011)(the "Subject Property").

6.     Plaintiff VIRGINIA PARSONS ("Parsons") is, and at all relevant times was, over the age of eighteen and resides in the County of Maui, State of Hawaii.

7.     Fitzgerald and Parsons (collectively "Plaintiffs") are partners in the subject property and both are signatories on the loan documents.

**Defendants**

8.     Defendant **American Savings Bank, F.S.B.** ("ASB") was, at all relevant times, a Hawaii Corporation with its principal executive offices located at 1001 Bishop Street, Honolulu, HI 96813.  ASB is owned by Hawaiian Electric Industries, Inc. (HEI), has several locations in Hawaii and provides financial services and was engaged in mortgage lending, mortgage banking, banking and mortgage warehouse lending, dealing in securities throughout the Hawaii.

9.     Defendant **MERScorp, Inc.** is incorporated in Delaware and has its principal place of business in Vienna, Virginia. Its shareholders and members are various companies engaged in the

business of mortgage banking and is not a registered business of Hawaii.

10.   Defendant **Mortgage Electronic Registration Systems, Inc.** ("MERS") is, and at all relevant time was, a corporation organized and existing under the laws of the State of Delaware and is a wholly-owned subsidiary of MERScorp, Inc. ("MERScorp")with no employees.  MERS is a membership organization boasting of over 4000 member banks and related businesses that operate an electronic registry designed to track servicing rights and ownership of mortgage loans in all fifty states in the United States and not a registered business of Hawaii.

11.   Upon information and belief, Defendant **Marc Ioane** is and Assistant VP President of American Savings Bank, FSB and Certifying Officer of MERS and a resident of Hawaii.

12.   Upon information and belief, Defendant **Susan Tilden Lau**, SR. VP President Of American Savings Bank, FSB and Certifying Officer of MERS and a resident of Hawaii.

13.   Defendants **JOHN AND MARY DOES 1-20** ("DOES DEFENDANTS 1-20), inclusive, are individuals, partnerships, corporations, associations or any other entity claiming any legal or equitable right, title, estate, lien, or other interest in the Subject Property.  Plaintiff reserves the right to amend this Complaint to add any such party as described in this paragraph as such

party's identity is ascertained through discovery or otherwise.

**14.**   Defendant ASB was a "member" in the MERS organization which was designed to track its member loans and servicing rights[1] for the purpose of securitization.

### ECONOMIC BACKGROUND TO THIS COMPLAINT[2]

#### Traditional Role of Banks

**15.**   The role of banks has changed in the last two decades. Traditionally, banks profited by charging borrowers a higher interest rate on the repayment of its loans than they paid to depositors.  The obligation to repay the loan was recorded on, and remained in, the books of the original lender until such time as the loan was repaid in full.  Lenders were therefore inextricably invested in the ability of the borrower to repay the loan. Banks must have cash to satisfy cash withdrawal requests of customers and the number of loans the bank could

---

[1]   MERS Corporation and its Mortgage Electronic Registration Systems contain data on 65 million loans – over half of all U.S. mortgages. MERS is an electronic registry designed to track mortgage servicing rights and ownership of U.S. residential mortgage loans during securitization that was founded 16 years ago by Fannie Mae, Freddie Mac, Bank of America, JPMorgan Chase and other large banks. *Source*: MERS Comments to the SEC: "Over 3000 MERS members have registered more than 65 million loans on the MERS® System" at http://www.sec.gov/comments/s7-08-10/s70810-58.pdf (last visited 1/21/11)

[2]   The economic processes that have given rise to this Complaint involve complex financial schemes and esoteric terminology.  For this reason, Plaintiff respectfully requests that this Court allow general background information in order to clarify the economic reality of these financial arrangements.

write was limited by regulations that protected depositors.[3] In other words, the bank was accountable and took seriously the risk of the borrower's potential default.

16.   Real estate investments were traditionally made based on an expected appreciation in the value of the land over time. Speculative trading in mortgage-based assets by institutional investors in open securities markets was primarily achieved by investing in a corporation (or other entity) set up to buy and sell interests in real property.  It was not possible for investors in open markets to speculate on individual family homes.

17.   Land records, including, mortgages, deeds of title, and assignments of mortgages were recorded in the Hawaii Bureau of Conveyances or the Assistant Registrar of the Land Court (or both) by the original lender.  Each of these records was therefore publicly available.

18.   A central theme often overlooked in both the traditional past and present securitization of mortgage loans,

---

[3]    A bank must maintain a certain level of cash compared to its liabilities to maintain solvency. A bank must hold some cash as **reserves,** which is the amount of money held in a bank's account at the Federal Reserve (Fed). The Federal Reserve determines the **legal reserves,** which is the minimum amount of cash that banks must hold in their accounts to ensure the safety of banks and also allows the Fed to effect monetary policy by adjusting the reserve level. Often, banks will keep **excess reserves** for greater safety.

the borrower focused on his personal credit sometimes to the point of being manic.  Stellar credit supposedly meant better interest rates and terms.  Maintaining credit was a key theme in the lending mantra, "don't worry, keep your credit score up and you can refinance..." In most cases, borrowers paid their obligations on time to maintain good credit until the economy collapsed – over which they had no control.

19.  All of this changed almost overnight and the public has Wall Street to blame for the current financial crisis. Investment banks, hedge funds and commercial banks made reckless bets using borrowed money. They created and trafficked in exotic investment vehicles that even top Wall Street executives — not to mention firm directors — did not understand. They hid risky investments in "off-balance-sheet" vehicles or capitalized on their legal status to cloak investments altogether.

20.  They engaged in unconscionable antitrust and predatory lending behavior that offered huge profits for a time, but led to dire consequences when the loans proved un-payable. And they created, maintained and justified an inflated housing bubble, the bursting of which has thrown the United States and the world into a deep recession, resulted in a foreclosure epidemic ripping apart communities across the country.

**Securitization and Mortgage-backed Assets**

21.  Securitization has fundamentally changed the way banks

and other financial market participants conducted business.  A "securitization" is a financial transaction in which assets – in this case, mortgages – are pooled and securities representing interests in the pool are issued to investors.

22.   The widespread view that the economic crisis is rooted in housing market problems is too simple. Between 1989 and today, securitization markets, and therefore the capital markets, replaced banks as the lead funding for home mortgages. It is true that excessive social engineering to over-stimulate housing purchase drove speculation. This was the result -- not the root -- of the excessive liquidity and irresponsible lending and borrowing that produced a withdrawal of liquidity to the mortgage finance market and an ongoing cycle of falling home prices. The actual root is a poorly developed securitization market that led to the ultimate breakdown of the private securitization market.

23.   In the instant case, the potential existed to convert the borrowers' loans to "mortgage-backed securities" ("MBS"). MBS that are debt obligations representing claims to the cash flows from pools of mortgage loans and are most commonly on residential property.  The first step in the securitization scheme was to start with mortgage registration with a company called Mortgage Electronic Registration Systems, Inc. ("MERS"), where the mortgage incorporates an ambiguous reference to the

mortgage holding company and names MERS as "Mortgagee".

24. As absurd as it may sound, the mortgage was purposely separated from the note; the mortgage naming MERS as "mortgagee" and the note containing no reference to MERS. It was not by accident – it was an intentional act in preparation for securitization and under the rules[4] by which all MERS members were obligated. MERS orchestrated the mortgage lending scheme behind the scenes from start to finish.

25. As of 2009 MERS had a 43-page Rules Manual consisting of 14 rules set forth as follows:

MERSCORP, INC.
RULES OF MEMBERSHIP
TABLE OF CONTENTS

| | | |
|---|---|---|
| RULE 1 | MEMBERSHIP | Page 2 |
| RULE 2 | REGISTRATION ON THE MERS® SYSTEM | Page 8 |
| RULE 3 | OBLIGATIONS OF MERS | Page 15 |
| RULE 4 | RULE CHANGES | Page 18 |
| RULE 5 | FEES | Page 19 |
| RULE 6 | PROCEDURES | Page 22 |
| RULE 7 | DISCIPLINARY ACTIONS | Page 23 |
| RULE 8 | FORECLOSURE | Page 25 |
| RULE 9 | USE AND OWNERSHIP OF INFORMATION | Page 28 |
| RULE 10 | INTERIM SECURITY INTERESTS | Page 31 |
| RULE 11 | SERVICES | Page 32 |
| RULE 12 | WARRANTIES | Page 33 |
| RULE 13 | INDEMNIFICATION | Page 37 |
| RULE 14 | NOTIFICATION TO MERS OF PENDING LAWSUITS | Page 39 |

26. MERS systematically designed the process of foreclosures for each of the 50 states.  Members were obligated

---

[4]   **MERS Rules** can be found on MERS website at http://www.mersinc.org/index.aspx

to follow the foreclosure routine set forth by MERS as found on
MERS 2004 website and noted by Sharon McGann Horstkamp, MERS
Corporate Counsel:

> "MERS has assembled a Foreclosure Manual to provide a
> state-by-state guideline for our Members to follow when
> foreclosing a mortgage loan in the name of MERS. Each
> state's procedure was developed jointly with local
> counsel in that respective state. There may be future
> versions of this Manual if needed. If you have any
> questions regarding the Foreclosure Manual, please
> contact MERS." [5]

27.   The originating lenders (banks or mortgage companies)
are then free to sell the mortgage loans to a "special purpose
vehicle" ("SPV").  SPVs are typically US-style trusts
established specifically to facilitate the securitization.  The
SPV may hold the mortgage loan on its balance sheet or place it
in a separate trust.  In either case, the SPV sells bonds to
investors and uses the proceeds from these bond sales to pay the
originating lender for the mortgage loan.

28.   A tidal wave of foreclosure litigation, however, has
made clear that the MERS has flaws. Because MERS, whose parent
company MERScorp Inc. has just 45 employees (MERS has no
employees and appears to be the alter ego of MERScorp) [6] in its

---

[5]   **Archived MERS website** for foreclosure manual (this archived
MERS interactive map takes a while to load, even on high speed).
http://web.archive.org/web/20051122142851/www.mersinc.org/Forecl
osures/index.aspx

[6]   **"Deposition of Secretary and Treasurer of MERSCORP- William
C. Hultman"**, at http://www.scribd.com/doc/36521121/Full-

Reston, Va., headquarters, lacks the manpower to participate in such cases, it allowed tens of thousands of lenders to sign off on documents as officers of MERScorp Inc., the owner of the registration system.

**29.** Meanwhile, as sloppy filings by overwhelmed lenders and law firms have reportedly become commonplace, federal and state officials and lawmakers are questioning the MERS system and judges are increasingly willing to listen to homeowners who say they are the victims of shoddy practices and bad record-keeping, reports **USA Today**.[7]

**Flexibility for the Originator**

**30.** Securitization also benefits the financial institution or corporation that originates the securitized asset. Without securitization, a bank making a home loan usually would hold that loan on its books, recognizing revenue as payments are made

---

Deposition-of-William-Hultman-Secretary-and-Treasurer-of-MERSCORP (last visited 3/21/11)

Q) Does MERS have any salaried employees?
A) No.
Q) Does MERS have any employees?
A) Did they ever have any? I couldn't hear you.
Q) Does MERS have any employees currently?
A) No.
Q) In the last five years has MERS had any employees?
A) No.

[7]   **Homeowners use 'show me the note' to fight foreclosure**, USA TODAY, 12/21/10 http://www.usatoday.com/money/economy/housing/2010-12-21-mortgagenote21 CV N.htm(last visited 3/21/11)

over time. To realize the value of the loan immediately, the bank can sell the whole loan to another institution, though this is generally not economical unless the loan is very large. The more efficient option is to pool similar loans together, as discussed above, and enter into a securitization transaction.

31.   Originators realize another benefit from securitization as the transfer of the asset to an SPV removes it from the firm's balance sheet. This can help the originator improve certain measures of financial performance such as return-on-assets (ROA). A way to gauge a firm's efficiency, ROA tells observers how many dollars are earned for every dollar of assets. Moving an asset off of the balance sheet while simultaneously increasing income has a positive effect on ROA and demonstrates to investors a more efficient use of capital.

32.   Banks realize a unique advantage from securitization. Removing loans from their balance sheet can lower regulatory capital requirements, or the amount and type of capital banks must hold given the size of their loan portfolio, to reflect lowered risk. The lender then no longer carries the inextricable risk associated with the borrower's potential default.  The lender no longer has the same economic incentives to ascertain the creditworthiness of the borrower.

33.   Originating lenders did not have to wait 30 years to be repaid; they were repaid almost before (and in some cases

well before) the ink was dry on the contracts. The risk of default was effectively passed to the investors, who may or not have known the risks they were exposed to. Underwriting criteria – whether an appraisal was inflated – simply ceased to matter. The problem is that no one bothered to warn the borrowers.

34. In some cases, more often than not, lenders like ASB used credit lines from other bank sources and funding warehouses to fund mortgage loans.

35. Mortgage lending simply became a factory line process. Original lenders worried less about the actual value of the property or ability of the borrower to sustain the mortgage for 30 years, than they did about their securitization and funding warehouse relationships.

36. Property values inflated at abnormally high rates from 2003 through 2008 and lenders, by their actions, implied instructions to their appraisers to exceed contracted sale pricing to meet mortgage loan requirements. That meant if the buyer wanted a mortgage for the property he was purchasing the appraiser would have to value the property for more than the purchase price or the buyer would have to have more out of pocket cash to put down on the property.

37. In some cases the appraised value would need to be 20% or higher than the purchase contract price. Appraisers that didn't follow the lender's protocol wouldn't make the short list

of appraisers the lender would continue to use. In 2005, over **8,000 appraisers sent out a petition ringing the Appraisal Fraud by Lenders, etc Alarm.  The alarm that could of saved the U.S. from the brink of economic disaster.** No one listened. Today there are more than 10,000 signatures.[8]

38.   In a June 14, 2007 letter from the Appraisal Institute to Ben Bernacke, Chairman, Board of Governors of the Federal Reserve[9] appraisers warned of predatory lending and mortgage fraud and the concern its members had:

> "This problem stacks the deck against honest and professional appraisers, who face pressure, intimidation, and even coercion from clients to inflate appraisals to facilitate transactions. A recent study found that 90 percent of appraisers were pressured by mortgage brokers, realty agents and others to raise property valuations to enable deals to go through, nearly double the findings of a similar study three years ago. Moreover, the survey found that 75 percent of appraisers reported "negative ramifications" if they did not cooperate, alter their appraisal, and provide a higher valuation."

39.   At the height of the subprime free-for-all underwriting guidelines were so purposely relaxed that lenders went to the extreme and wrote loans for 100% of the real estate contracted price as long as the appraised value supported the

---

[8]     **Appraisers Petition**, Concerned Real Estate Appraisers from across America http://appraiserspetition.com/index.htm (visited 3/21/11)

[9]     **Appraisal Institute** letter dated June 14, 2007 to Chairman Bernanke(visited 3/21/11): http://www.appraisalinstitute.org/newsadvocacy/downloads/ltrs ts tmny/2007/AI-ASA-ASFMRA-NAIFALettertoFed June2007.pdf

price.  These were called 80/20 loans.  The first mortgage would
be for 80% of the value and a 2nd loan, sometimes a mortgage or a
HELOC (homeowner equity line of credit), would carry the 20%
balance.

**Consolidation and Growth of Top-Tier Financial Institutions**

40.  The term "too big to fail" ("TBTF") refers to certain
financial institutions that are so large and interconnected that
they cannot be allowed to go into uncontrolled bankruptcy;
defaulting on their obligations will create significant losses
for other financial institutions, potentially triggering a
domino effect that causes the entire financial system to
collapse.[10]

41.  What makes a financial institution too big to fail is
the amount of collateral damage that its uncontrolled failure
could cause.  This damage can take several different forms.  A
failing institution could have thousands of open transactions
with counterparties, which are largely other financial

---

[10]    **"Lehman's Demise Triggered Cash Crunch Around Globe:
Decision to Let Firm Fail Marked a Turning Point in Crisis"**, *The
Wall Street Journal*, Monday September 29,2008, at A1 The
bankruptcy of Lehman Brothers in September 2008 accelerated the
collapse of AIG, forcing it to rely on funds from the Federal
Reserve. Lehman's failure also caused a sudden loss of
confidence in all money market funds; in turn, the flood of
money out of the money market funds cause the commercial paper
market to freeze, thus endangering the ability of many
corporations to operate on a day-to-day basis. The sequence of
failures was only stopped by massive government rescue measures;
at http://online.wsj.com/article/SB122266132599384845.html

institutions.[11]

**42.**   During the prelude to the crisis, securitization markets too often operated in a "Wild West" environment where rules were opaque, standards varied, and useful and timely disclosures to investors of the performance of loan level collateral were hard to come by, if available at all. Volatility, inefficiency, and confusion reigned, all to the advantage of issuers and the disadvantage of investors and the public.

**43.**   Beyond the collateral damage that large interconnected financial institutions inflict on the financial system, TBTF institutions create significant problems for society as a whole.

**44.**   First, when TBTF institutions come to the brink of failure, they have to be bailed out, usually by the government (and taxpayers).  A TBTF bank cannot be allowed to go into ordinary bankruptcy procedure because its creditors and counterparties would be cut off from their money supply for months, which could be fatal.  This means that government must keep failing banks afloat and, without a credit threat of bankruptcy to negotiate with, must honor all of the

---

[11]   For example, at the time of its collapse, the face value of AIG's open derivatives contracts was $2.7 trillion - $1 trillion of it was held by only twelve financial institutions. *Source*: **13 Bankers: The Wall Street Takeover And The Next Financial Meltdown, Pg. 202**, By Simon Johnson, James Kwak

bank's obligations; in other words, the money the bank lost has
to be made up with public funds.

45.    The second problem to society is that TBTF
institutions have a strong incentive to take excessive risk,
since the government effectively guarantees their losses in an
emergency.  All banks are highly leveraged, which means that
they are betting with other people's money.  There are many
strategies - of which, securitization is the most popular - that
increase returns for shareholders (and executives) while
shifting potential losses onto someone else.

46.    The third and arguably most significant problem for
society is that TBTF banks are bad for competition and therefore
bad for the economy.  Because large "megabanks" have an implicit
government guarantee, bond investors are willing to lend them
money at lower interest rates than their smaller competitors.
This subsidy makes it harder for smaller banks to compete,
deterring new entrants and only strengthening the long-term
process of consolidation and concentration in the financial
sector.

47.    Elizabeth Warren's[12] recent testimony[13] before the

---

[12]    Elizabeth Warren is the Special Advisor to the Secretary of
the Treasury for the Consumer Financial Protection Bureau Before
the Subcommittee on Financial Institutions and Consumer Credit
Committee on Financial Services.

Congressional House of Representatives on March 16, 2011 stated

succinctly that smaller local banks were struggling to maintain

customers who were induced by deceptive marketing and

solicitation used by larger lenders capturing their customers:

> "Community banks and credit unions have worked for
> decades to build a reputation for honesty, transparency,
> and trust. As they have told me many times, a small-town
> banker can't afford to surprise a customer with a fee
> hidden in the fine print or trap a customer in a deceptive
> mortgage. Many community bankers see their customers every
> day at the grocery store, at Little League practice, and
> at school plays. They depend on long-term partnerships,
> and they build their business models around clarity and
> fair pricing. But they face competition from lenders who
> are willing to make quick profits by hiding the real costs
> and risks of what they sell. The community banks lose
> customers who learn only months or years later that the
> alternative products that seemed so enticing were in fact
> far more expensive. Practices that hurt our nation's
> families also hurt our community banks."

    **48.** At present, there are only six American banks that are

in the top 50 banks in the world – Bank of America, Citigroup,

Goldman Sachs, JPMorgan Chase, Morgan Stanley, and Wells Fargo.

Of these six megabanks, four – Bank of America, Wells Fargo,

Citigroup and JPMorgan Chase – maintain over 63% of the market

share for mortgage originations. And this position changes

daily.

    **49.** Participants in the securitization scheme did not have

---

[13]  <u>Testimony of Elizabeth Warren</u> before the Subcommittee on
Financial Institutions and Consumer Credit Committee on
Financial Services United States House of Representatives,
Wednesday, March 16, 2011 can be found at
http://financialservices.house.gov/media/pdf/031611warren.pdf
(last visted 3/16/2011)

to be "megabanks", but merely had to play by the same rules set forth by the big banks.  And lesser banks, such as Defendant ASB helped to originate and service loans to fill demand as other entities were failing.

50.   Lenders like ASB acted like a "community" bank but for better or worse, played by the rules of the larger firms.  ASB didn't have to sell a loan instantly to Wall Street for the securitized Trusts, they had alternative avenues[14] through various sources in which to move loans at will, when and if needed. ASB used credit lines from Federal Home Loan Bank (FHLB) for mortgage funding purposes (refer to HECO Annual Reports 2006-2009).[15]

51.   ASB's use of MERS initiated the process for securitization whether through FHLB "PLMBS" (refer to fn. 7) or

---

[14]    Pursuant to the HEI 2007 annual Report, ASB participated in more risky "private label" securities (PLMBS):"ASB owns federal agency obligations, **private-issue mortgage related securities.."** **Private-issue mortgage related securities** are called PLMBS that are mortgage pass-through certificate securities entitling the holder to income payments from pools of mortgage loans.  The securities are referred to as "private label" because they are issued by private entities instead of the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"), which are U.S. government-sponsored enterprises ("GSEs"). In the early 2000s, PLMBS became an increasingly important adjunct to the GSEs, forming a capital market for mortgages that could not be sold to the GSEs. PLMBS were issued by Federal Home Loan Bank and its bank members such as ASB.

[15]    **HECO Annual Reports** are found at http://phx.corporate-ir.net/phoenix.zhtml?c=101675&p=irol-reportsannual

GSEs. The preliminary act of securitization was instigated by the intentional act of bifurcation[16] of the mortgage and note using MERS in preparation for securitization.

52. Due to the failure and mergers related to eminent demise of what was once thought to be TBTF banks like IndyMac, Wachovia, Washington Mutual, Countrywide, Lehman Bros., and Bear Sterns, avenues to securitized loans and investors dwindled.

53. The big banks acted in concert. No longer were there individual competing banks available to take over and refinance the Plaintiff's loan. Conspiring together, it is well-known that the banks had faulty underwriting standards, inflated appraisals and ratings on a nationwide basis for years. A U.S. Court of Appeals case for the First Circuit, Resolution Trust Corporation v. Key Financial Services Inc., 280 F. 3d 12 (Decided 2002)[17] ("RTC v. Key") decided in favor of investors who sued over

---

[16]      In re Bird, 2007 WL 2684265, at ¶¶ 2-4 (Bkrtcy.D.MD. 2007) ("The note and mortgage are inseparable; the former as essential, the latter as an incident. An assignment of the note carries the mortgage with it, while an assignment of the latter alone is a nullity. . .It is equally absurd to assume that such bifurcation was intended because such a bifurcation of the note from the deed of trust would render the debt unsecured."); In re Leisure Time Sports, Inc. 194 B.R. 859, 861 (9th Cir.1996) (stating that "[a] security interest cannot exist, much less be transferred, independent from the obligation which it secures" and that, "[i]f the debt is not transferred, neither is the security interest").

[17]      Resolution Trust Corporation v. Key Financial Services Inc., 280 F. 3d 12 (Decided 2002) can be found at http://caselaw.findlaw.com/us-1st-circuit/1019074.html

material breaches in representation, including inflated appraisal and title issues, which opened the flood gates for investor lawsuits.

54.   Unfortunately, RTC v. Key was not an isolated incidence since the banks and investment houses shared their consumer information, combined with the facts in more recent history that banks were seized, the SEC sued for various acts of fraud, and investors of the securitized trusts had been suing the Defendants and their pals for countless years alleging non-disclosure and reckless negligence, the entire economy collapsed as a result.

55.   The Plaintiffs, at this point, were unwittingly trapped in a Ponzi scheme where their loan, among thousands of others, had been manipulated to their detriment by the Defendants. Through no fault of the Plaintiffs, it was impossible sell or rent their home due to the loss in value. This was further complicated by the fact that neither refinancing nor reduction modifications were available.

56.   As awareness of the banks' bad acts heightened, mortgage lending grinded to a halt and shortly thereafter housing values began to plummet.

57.   Worldwide confidence in the United States securitization marketplace all but evaporated as the financial

industry collapsed due to numerous investor lawsuits for
fraudulent securities and intervening government control
asserted on several banks as well as Fannie Mae and Freddie Mac
with the appointment of a conservatorship in September 2008. It
used to be the general conception that people robbed banks;
however, from 2000 – 2008 it has become increasing more apparent
that the banks have been robbing the people.

**PLAINTIFFS' FACTUAL BACKGROUND**

58.   On or about July 2007, Plaintiffs began researching a
lender for a parcel of property [aka the Subject Property] they
wanted to buy and build a home on.  Plaintiffs met with several
lenders and were finally sold on the personal service of an ASB
mortgage broker and loan officer, Barbara Franco, who promised
Plaintiffs a $200,000.00 equity line of credit at the end of
their construction project.

59.   Plaintiffs provided full financial documentation for
the loan as alleged by ASB to be required to obtain a fixed 30
year financing loan package.  The initial interest rate promised
to the Plaintiffs was 6.25%.

60.   Plaintiffs had a working relationship with ASB as they
referred their customers to an alphabetical list of lenders and
the majority of their clients chose ASB.  Plaintiffs were often
invited to speak at ASB construction seminars that their
customers in addition to other prospects attended.

**61.**   Plaintiffs assisted their ASB customers in putting together their construction package for the loan and often hand delivered the documents to the ASB offices directly to the loan officer.

**62.**   Plaintiff Parsons on more than one occasion would be sitting with the loan officers when they placed calls to the appraisers and gave them the cost of the loan.  This was not an unusual occurrence.

**63.**   On December 17, 2007, Plaintiffs executed a promissory note (the "Promissory Note" or "Note") agreeing to pay $800,775.00 to ASB as "Lender".  The Note inaccurately reads **six and one-quarter percent (6.625%)** (attached hereto as Exhibit "1", Note).

**64.**   The Note included funds for the construction of the residence on their parcel. This was known as a construction to permanent financing mortgage loan.

**65.**   The construction was bonded as mandated by ASB for all construction loans. ASB maintained and controlled the disbursements of the Plaintiffs' funds throughout the construction process (Exhibit "2", Construction Loan Agreement).

**66.**   On the same day, Plaintiffs entered into a mortgage (the "Mortgage") ambiguously granting both ASB and MERS as separate corporations the position of "mortgagee", as well as acknowledging ASB as lender for the Subject Property (attached

hereto as Exhibit "2A", Mortgage).  The Mortgage document was recorded in the State of Hawaii Bureau of Conveyances as Doc. No. 2007-220885 dated December 26, 2007 with Mortgage Electronic Registration Systems, Inc. as Grantee and mortgagee.

67.  At signing Plaintiffs inquired about the MERS paragraph in the mortgage and were told by the bank officer overseeing the signing that she didn't know but agreed that it sounded like "just a recordation processing company" and "not to be worry" because this had been the same procedure for hundreds of other loans.

68.  Upon information and belief Plaintiffs allege that the reason for the convoluted reference to both MERS and ASB as mortgagee stems from earlier lawsuits in 2004 and 2005 where courts were ruling against MERS as "nominee".  One early precedent setting ruling by Judge Walt Logan in In re Mortgage Electronic Registrations Systems, Inc., Cir. Ct. Pinellas County, Fla., Walt Logan, Judge, 8/18/05) (Numerous case numbers) held against MERS with prejudice and stated within the Order:

> "The Court noted that in the Order To Show Cause that
>
> "…The Court is unclear as to how a corporation can sue as a "nominee" for another corporation.  Corporations are generally not allowed to pursue matters without counsel and to the undersigned's knowledge, the law has not allowed one corporation to act as Nominee for another in bringing a lawsuit.  No authority has been shown to the Court to support a corporation suing as "Nominee" of

another corporation…"[18]

69. ASB was trying to cover the bases and still play the securitization game to the detriment of the Plaintiffs.  If ASB even remotely suspected that MERS as mortgagee could lead to problems, and actually intended to maintain Plaintiffs' mortgage loan for 30 years, there would have been no necessary reason to include MERS in Plaintiff's mortgage loan documents.

70. The Mortgage document was a standard "Hawaii single Family Fannie Mae/Freddie Mac Uniform Instrument with MERS", Form 3012[19] and the Promissory Note were a Multistate Fixed Rate Note Single Family Fannie Mae/Freddie Mac Uniform Instrument, Form 3200.

71. The appraisal, dated September 4, 2007, commissioned from a short list of selected ASB appraisers for the property stated a value of $1.15 million dollars upon completion

---

[18]    In re Mortgage Electronic Registrations Systems, Inc., Cir. Ct. Pinellas County, Fla., Walt Logan, Judge, 8/18/05) (Numerous case numbers) can be found at http://www.floridalegal.org/Umbrella%20Groups/MERS/Order%20Dismissing%20MERS.pdf (last visited 3/19/11).

[19] Fannie Mae buys loans from approved mortgage sellers, either for cash or in exchange for a mortgage-backed security that comprises those loans and that, for a fee, carries Fannie Mae's guarantee of timely payment of interest and principal. The mortgage seller may hold that security or sell it. Fannie Mae may also securitize mortgages from its own loan portfolio and sell the resultant mortgage-backed security to investors in the secondary mortgage market, again with a guarantee that the stated principal and interest payments will be timely passed through to the investor.

(attached herewith Exhibit "3", Appraisal).

72.   The appraisal was also prepared on the standard
Freddie Mac Form 72 / Fannie Mae Form 1025.  Based on the value
of this appraisal, ASB promised an additional equity credit line
of $200,000 upon completion of the construction as an inducement
to sell the Plaintiffs the mortgage loan.

73.   Plaintiffs Fitzgerald and Parsons were in the building
material supply business, designed their own plans and provided
the construction materials at wholesale pricing. The cost of
construction generated approximately a 30% savings that was
fully documented for the bank.  However, in November 2008 upon
completion, ASB failed to follow through with the equity line of
credit.

74.   As a prerequisite of the construction loan, ASB
mandates a licensed general contractor be used and contracted
for the construction and a material supply house bonding company
be used to disburse the funds for construction.  ASB controlled
the disbursement of construction draws to the bonding company
totaling $392,000.00 on behalf of the borrowers establishing a
fiduciary duty to the Plaintiffs for the care and control of the
mortgage loan funds.

75.   Throughout the construction, ASB also inspects the
construction project at each phase completion as a requisite for
construction draw disbursement.

76.   ASB maintains a short list of approved material supply bonding companies from which the borrower must choose. Plaintiffs requested to use an actual insurance bonding company in lieu of a "material house supplier" bonding agreement for which no insurance is attached.  ASB rejected the request and demanded Plaintiffs to choose from their selected list of "approved" material supply house bonding companies. This increased the price of construction compared to the cost of an actual bonding insurance firm.

77.   During the construction, ASB's approved bonding company, Pacific Source, Inc. began to manipulate the Plaintiffs' construction draw funds that were deposited to the Pacific Source Bank of Hawaii account # 0001-025171.

78.   Although this was Plaintiffs' personal construction project, the bonding company began in January 2008 to force construction funds from the construction project to Plaintiffs' business account and pressed for the Plaintiffs to draw more funds than needed.

79.   Plaintiff Parsons had several conversations and meetings with ASB mortgage officers, Barbara Franco, Karl Baker, Marlene Lum, Susan Hori about the manipulation of funds, yet ASB refused to intervene.

80.   A final Draw request was processed by the Plaintiffs after completion and public notification on or about October 23,

2008 indicating that the Plaintiffs wanted $19,919.02 deposited to Pacific Source and $11,063.98 deposited to ASB for Plaintiff's loan #20371692. Accompanying the draw request was an Unconditional Waiver and Release Upon Final Payment signed by the Contractor (Exhibit "4" Draw Request #5 and Release).

81.   ASB refused Plaintiffs' draw request, even though Plaintiffs' complained about the manipulation of the bonded funds by the material supplier, and subsequently deposited the rest of the construction draw finds in to a new Pacific Source, Inc. American Savings account #0450016366.

82.   Plaintiffs did not know at the time where or how the money had been deposited.  Plaintiffs learned on or about December 26, 2010 through a production of documents subpoena resulting from a bankruptcy 2004 Examination of ASB, when ASB produced a draw request dated 10/27/08 in the amount of $30,983.00 that it substantially differed from the 5 previous draw requests Plaintiffs actually drafted, approved and signed (Exhibit "5" Pacific Source Draw Request #5).

83.   Plaintiffs do not recognize Exhibit "5".  The Pacific Source draw request #5 was deposited to a Pacific Source ASB account.  All previous draw requests were deposited to a Pacific Source Bank of Hawaii account.

84.   Over $84,000 of Plaintiffs' construction funds were diverted by the bonding company with the assistance of ASB to

unrelated accounts and the Plaintiffs were powerless to stop the
conversion of funds.

**85.**  At the time of the construction and mortgage,
Plaintiffs conducted substantial business with ASB who was the
lender for loans provided to Plaintiff's construction material
customers. Plaintiffs supplied building materials for affordable
housing.

**86.**  Unknown to the Plaintiffs was the fact that ASB's loan
portfolio was made up of mortgage-backed securities ("MBS") and
linked into securities' offerings through a company known as
Mortgage Electronic Registration Systems, Inc. aka "MERS.

**87.**  It appears ASB used and/or invested various companies
funds into Mortgage-backed securities. ASB realized the
declining market as stated in the Hawaiian Electric Industries
("HEI") 2006 Annual Report[20]:

> "Other factors primarily affecting ASB's operating
> results include fee income, provision (or reversal of
> allowance) for loan losses, gains or losses on sales of
> securities available-for-sale and expenses from operations.
> . .
>    As of December 31, 2006 and 2005, the unrealized losses,
> net of tax benefits, on available-for-sale investment and
> mortgage-related securities (including securities pledged
> for 36 repurchase agreements) in AOCI was $35 million and
> $36 million, respectively." (HEI AR 2006, pg. 35-
> 36.)(emphasis added)

This was followed by the 2007 Annual Report wherein it was

---

[20]    HEI Annual Reports are found at http://phx.corporate-
ir.net/phoenix.zhtml?c=101675&p=irol-reportsannual

stated:

> "Volatility in the interest rate environment during the second half of 2007 was primarily due to the credit issues arising from the subprime mortgage crisis and concerns about the health of the economy. Although the overall level of Treasury rates started to decline in the second half of 2007, ASB continued to face margin pressure as wholesale borrowing costs and deposit rates, which are generally correlated with the 3-month Libor rate, did not decline accordingly. . . (HEI AR 2007, pg. 6)

> Pressures from declines in the housing market will impact securities held in ASB's investment portfolio. Foreclosures within the subprime sector of the market have increased risk premiums for all mortgage-related securities, especially those underwritten in 2006 and 2007 for which underwriting standards for the collateral of the mortgage-related securities were thought to be most troublesome. While ASB does not have material exposure to securities backed by subprime collateral and does not hold any subprime positions issued within the last five years, a deep recession led by a material decline in housing prices could materially impair the value of the securities it currently holds. As of December 31, 2007, 74% of the portfolio is held in debentures or mortgage-related securities issued by government-sponsored entities. The remaining 26% of the portfolio is composed of mortgage-related securities issued by private issuers (25% are rated AAA and 1% are rated AA or A by nationally recognized statistical rating organizations). . .The mortgage-related securities portfolio currently holds two positions whose principal is guaranteed by bond insurance companies whose ratings have either been downgraded or are on watch." (HEI AR 2007, pg. 43)

**88.** The HECO Annual Reports indicate that by 2006 ASB recognized that mortgage-backed securities were failing and more risky than originally thought as they began to systematically unload the MBS; however, knowing that the mortgage-backed securities industry scheme was collapsing the economy, ASB continued to participate with MERS and remained a MERS "member"

making securitized mortgage loan transactions through 2007 and made the commitment with the Plaintiffs on or about December 17, 2007; while unloading the MBS HECO portfolio.

89.   By the end of first quarter 2008, ASB was failing to follow through on loan commitments to the Plaintiffs' customers which would have ultimately generated their income.

90.   ASB had also stipulated to a Consent to the Issuance of a Cease and Desist Order by the Office of Thrift Supervision ("OTS")[21], Order No. WE-08-002, dated January 23, 2008.   The OTS had found that ASB had failed to comply with various Federal statutes including the Currency and Foreign Transactions Reporting Act, 31 U.S.C. § 5311 **et. seq**; 31 C.F.R Part 103 and the OTS, 12 C.F.R. § 563.177 and 563.180; as well as various mortgage related statutes including, but not limited to, RESPA, TILA and the Home Mortgage Disclosure Act, 12 U.S.C. § 2801 **et. seq.**, 12 C.F.R. Part 203 (Regulation C).

91.   ASB was not forthcoming about the economic collapse or the overall securities fraud that caused the nation's economic decline.   In fact, when the Plaintiffs realized that this hardship would cause an inability to meet mortgage payments and called ASB they were informed that until they missed payments ASB would not consider modification assistance.

---

[21]    **Consent to the Issuance of a Cease and Desist Order** by the Office of Thrift Supervision can be found at http://www.ots.treas.gov/ files/enforcement/96350.pdf

**92.** ASB had a fiduciary duty to the Plaintiffs not only as a bank and customer, but as the broker and client for the additional business between them.

**93.** Plaintiffs maintained constant contact with ASB but the economic collapse had specifically targeted the housing and construction industry and very few loans were being processed, if any during 2008 and much of 2009.

**94.** In 2009 the ASB mortgage-backed securities debt had apparently been sold as the HEI Annual Report to Shareholders stated:

> "In the fourth quarter of 2009, when we saw an attractive market opportunity, we made a strategic decision to sell our portfolio of private-issue mortgage-related securities, resulting in an after-tax loss of $19 million, but eliminating the risk of future charges from these securities, and improving our prospects for more stable earnings from the bank to support your dividend." (HEI 2009 Shareholder Report, pg. 3)

**95.** Plaintiffs have documented over $182,884.00 invested in the Property plus an estimated cost in sweat equity of $117,600.00.

**96.** The most recent appraisal conducted by ASB devalued the property to $725,000.00 due to the economic collapse caused by the banking securities fraud which created an artificially inflated real estate market on Maui, a point known to ASB at the time they sold the Plaintiffs the mortgage loan.

**97.** On or about August 2009, Plaintiffs contacted and

urged ASB to allow them to modify their loan through the HAMP
program.

98. On or about September 2, 1009, Plaintiff's learned in
a letter from "Leilani", Mortgage Adjustor at ASB, that because

*"American Savings Bank did not sell your loan to Fannie Mae of Freddie
Mac; therefore is it not eligible for the Obama Administration Home
Affordable Modification Program."* (Plaintiff's Exhibit "6", ASB
Letter dated 9/2/09)

99. Plaintiff's continued to provide required modification
documentation that remained under review until Plaintiffs
received notification of a non-judicial foreclosure by MERS.

100. ASB required personal taxes which Plaintiff completed
and faxed in October 2009.

101. On or about November 3, 2009, the Plaintiffs both
received letters from attorney Marvin Dang announcing
Lender/Mortgagee Mortgage Electronic Registration Systems, Inc.
was issuing a NOTICE of a non-judicial foreclosure sale
(attached herewith as Exhibit "7", Marvin Dang letter).

102. Plaintiffs immediately contacted ASB as they thought
they had been working toward a modification. On or about
November 4, 2009, Plaintiff Parsons emailed another copy of the
2008 taxes to Leilani Tuitele at ASB.

103. Several phone calls and emails by the Plaintiffs
followed and on or about November 13, 2009, Damon J. Stanford
promised by email that a Loss Mitigation Specialist would
contact the Plaintiffs regarding forbearance.  No call was ever

received by the Plaintiffs.

**104.** On or about November 16, 2009, Mr. Stanford advised the foreclosure sale date would proceed.

**105.** The Plaintiffs called Mr. Dang who was named on the foreclosure notice Plaintiffs received and explained the economic situation and asked for a modification and offered a payment arrangement of two payments $11,000.00 over the following four weeks.

**106.** Mr. Dang refused the request and offer without even speaking to his client.  This appears to be at about the same time ASB unloaded their mortgage-related debt to another buyer (*see ¶78.above* HEI 2009 Annual Report to Shareholders).

**107.** On December 14, 2010, Plaintiff Parsons filed a Chapter 11 bankruptcy petition.

**108.** On or about February 11, 2010, MERS filed a Motion for Relief From Automatic Stay (hereinafter "MERS Relief Motion") in Parsons' bankruptcy which was scheduled for hearing for March 10, 2010 for the subject property.

**109.** MERS originally sought their MERS Relief Motion before the Bankruptcy Court, the Court assumed MERS had standing and would follow the legal procedures set forth by Hawaii Revised Statutes.

**110.** At the time of the original MERS Motion for Relief from Automatic Stay neither Plaintiff knew who MERS was nor did

they know that ASB was a member of MERS who paid and shared fees with MERS from the borrowers' proceeds that did not benefit the borrowers.

**111.** The Plaintiffs thought they were speaking with American Savings Bank attorneys and only recently learned much later in or about June 2010 that MERS is a separate corporation and is not American Savings Bank.

**112.** MERS filed the original motion and made the request for the termination of the automatic stay in Parsons' bankruptcy based on the stated facts in their MERS Relief Motion that MERS was the "secured Creditor" and that the Plaintiffs had failed to make payments to MERS.

**113.** Specifically on page 1 of the MERS Memorandum in Support of the Motion (Exhibit "8", MER Motion for Relief from Stay):

> "The note and the Mortgage are in Default because of the failure of Fitzgerald and the Debtor **to make payments to MERS.**" (emphasis added).

**114.** MERS further stated on page 2, paragraph 3 of the Motion for Relief From The Automatic Stay:

> "If MERS is not permitted to foreclose the Mortgage on and sell the Property, MERS will suffer irreparable injury, loss, and damage."

**115.** MERS Motion for Relief from the Automatic Stay was also accompanied by the Declaration of one Marc Ioane ("Ioane") in alleged support of MERS' Relief Motion. The Ioane Declaration

on or about February 10, 2010, under penalty of perjury under the laws of the United States of America that the Declaration was true and correct, both recited the same factual allegations as the MERS' Relief Motion, as to the Plaintiffs making, executing, and delivering the Promissory Note, Mortgage and making payments to MERS.

**116.** Defendant Ioane, in his declaration made the following statements (Exhibit "9", Declaration in Support of the Motion for Relief From The Automatic Stay by Marc Ioane):

a. "I have personal knowledge and am competent to testify to the matters stated in this Declaration."

b. "the records regarding the loan this is the subject of this action are made and maintained in the course of MERS's regularly conducted business activity."

c. "Fitzgerald and the Debtor signed a Note in favor of American Savings Bank F.S.B. ("ASB") and a Mortgage in favor of MERS."

d. "The subject real property which is secured by the MERS Mortgage is located at 2276 Vineyard Street, Wailuku, Hawaii 96793, Tax Map Key No.: (2) 3-4-016:011 ("Property"), and is described in the MERS Mortgage."

e. "The MERS Mortgages is a first mortgage on the Property."

f. "The total owed to MERS as of December 14, 2009 is $853.393.71, plus interest, advances, costs, and attorney's fees."

g. "The Debtor is delinquent in making post-petition mortgage loan payments to MERS of $12,625.59 as of February 5, 2010."

h. "If MERS is not permitted to deal with the Property and to evict and remove the Debtor and Debtor's property from the Property, MERS will suffer irreparable injury, loss,

and damage."

    i. "…I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct."

**117.** Thereafter, the Plaintiffs attempted again to request modification with ASB but were told that ASB no longer had control over the loan to make modification decisions.

**118.** Plaintiffs began to realize that ASB's disinterest in payments and modification, as will be discussed in further detail within this Complaint, appeared to more about bailing out of a scandalous securitization ordeal than about borrowers' ability to pay.

**119.** MERS continued to foreclose on the property scheduling an auction for June 15, 2010 until the Fitzgerald filed Chapter 13 on June 15, 2010, Case No. 10-01806.

**120.** A few months later, the same counsel, Marvin Dang, brings forth yet again another Motion for Relief From the Automatic Stay for the subject property and same loan only this time on behalf of American Savings Bank ("ASB Relief Motion").

**121.** The motion makes only a slight reference to MERS in the Declaration of Susan Tilden Lau (Exhibit "10", ASB Motion for Relief from Stay) where she states she is a "Certifying Officer" of Mortgage Electronic Registration Systems, Inc. ("MERS") and states specifically in paragraph 3:

      **"The Debtor and Parsons signed a Note in favor of ASB**

**and a Mortgage in favor of MERS."**
However, the Lau Declaration is nearly verbatim with only a slight variation replacing the MERS with ASB.

**122.** Conspicuously absent from the ASB Relief Motion and the Lau Declaration (submitted under oath as being "true and correct") was any reference of transfer or assignment of the Plaintiffs' Mortgage from MERS to ASB.

**123.** MERS is named on the Plaintiff's mortgage as mortgagee and has never made a legal assignment to ASB of the mortgage pursuant to its own Rule 8.[22] MERS Rule 8 (in relevant part):

### RULE 8

### FORECLOSURE

*Section 1.* (a) With respect to each mortgage loan for which Mortgage Electronic Registration Systems, Inc. is the mortgagee of record, the beneficial owner of such mortgage loan or its servicer shall determine whether foreclosure proceedings with respect to such mortgage loan shall be conducted in the name of Mortgage Electronic Registration Systems, Inc., the name of the servicer, or the name of a different party to be designated by the beneficial owner.

(d) In the event that the beneficial owner or its designated servicer determines that foreclosure proceedings shall be conducted in the name of a party other than Mortgage Electronic Registration Systems, Inc., **the servicer designated on the MERS® System shall cause to be made an assignment of the mortgage from Mortgage Electronic Registration Systems, Inc. to the person designated by the beneficial owner**, and such beneficial owner shall pay all recording costs in connection therewith.(emphasis added).

---

[22] **MERS Rules** can be found on MERS website at http://www.mersinc.org/index.aspx

(i) The Member shall not plead MERS as the note-owner in any foreclosure document; including but not limited to, the foreclosure complaint.

(ii) The Member shall not plead MERS as a co-plaintiff in a foreclosure action.

(iii) If the note is lost or cannot be located, the Member shall not commence a foreclosure action in the name of MERS, but rather must assign the mortgage out of MERS.

(b) In non-judicial foreclosure states, if the Member chooses to foreclose in MERS name under the power of sale provision in the security instrument and is not seeking a deficiency judgment, then the note does not need to be in the possession of the Member's MERS Certifying Officer when commencing the foreclosure action; provided, however, that under no circumstances may the Member allege that the note is in their possession unless it so possesses."

**124.** ASB's misrepresentations are compounded by Declarations of their corporate officers who were also Certifying Officers of MERS.  In Parsons' bankruptcy relief from stay motion by MERS, the Declaration of Marc Ioane, Assistant VP President of American Savings Bank, FSB and Certifying Officer of MERS, dated February 10, 2010 states in his ¶ 4 (refer to Exhibit "9"):

"4.  True and correct copies of the note and mortgage were provided to me by MERS' representatives under whose control the record of the subject loan are kept in the course of MERS' regularly conducted business activity."

**125.** This statement is in opposition to the Declaration of Susan Tilden Lau, Sr. VP President of American Savings Bank, FSB and Certifying Officer of MERS, dated October 26, 2010 (refer to

Exhibit "10") states in her ¶ 4:

> "4.    True and correct copies of the note and mortgage
> were provided to me by ASB's representatives under whose
> control the record of the subject loan are kept in the
> course of ASB's regularly conducted business activity."

126.  ASB has failed to provide a valid assignment from MERS
of the mortgage that they split away from the note in their
securitization scheme. MERS has admitted that the very
foundation of its business model as described herein requires
that the Note and Mortgage travel on divergent paths.[23]

127.  It appears, ASB realized its own misrepresentations
as it originally ordered MERS to motion for relief of stay in
Parsons' bankruptcy; however, as Courts around the country began
to shut MERS out of the foreclosure process and as Parsons
requested reconsideration of the Court's initial relief order,
ASB knew that they would meet with informed resistance.  Yet,
ASB failed to obtain the proper paperwork between the two
corporations as their contracted membership rules mandate.

128.  It appears, ASB did not hold the note and mortgage in
June 2010 when MERS was granted the relief from stay in Parsons'
bankruptcy and there have been no assignments recorded in the
Hawaii Bureau of Conveyances.

129. The mortgage and the note were separated which is made
obvious by the motions and their accompanying declarations. A

---

[23] **In re: Ferrel L. Agard**, Case No. 810-77338-reg, United States
Bankruptcy Court, Eastern District Of New York (2/10/2011)

note and mortgage are inseparable. *See Carpenter v. Longan*, 83
U.S. 271, 274 (1872). The court in In re: Ferrel L. Agard, Case
No. 810-77338-reg, United States Bankruptcy Court, Eastern
District Of New York (2/10/2011) recently noted:

> "While it is generally true that a mortgage travels a
> parallel path with its corresponding debt obligation,
> the parties in this case have adopted a process which by
> its very terms alters this practice where mortgages are
> held by MERS as "mortgagee of record." By MERS's own
> account, the Note in this case was transferred among its
> members, while the Mortgage remained in MERS's name.
> MERS admits that the very foundation of its business
> model as described herein requires that the Note and
> Mortgage travel on divergent paths. Because the Note and
> Mortgage did not travel together, Movant must prove not
> only that it is acting on behalf of a valid assignee of
> the Note, but also that it is acting on behalf of the
> valid assignee of the Mortgage." Fn. *See Carpenter v.*
> *Longan*, 83 U.S. at 274 (finding that an assignment of
> the mortgage without the note is a nullity).

   **130.** The deception of the Defendants also damaged the
Plaintiffs' ability to modify their loan. Not only did ASB 'no
longer have control over the mortgage', on or about September
2009, Plaintiffs learned that although Fannie Mae and Freddie
Mac form documents were used throughout and including the
mortgage and closing documents, ASB had not funded and
insured the loan through customary channels.

   **131.** MERS' mission was to register every mortgage loan in
the United States[24] to facilitate trading in mortgage-backed

---

[24] **"About MERS,"** MERScorp, Inc. at
www.mersinc.org/about/index.aspx. (Last visited 1/22/11).

securities. The MERS monopoly now includes more than 80 percent of the mortgage lenders and servicers active in the United States real estate market. Since its creation, MERS has undermined and eviscerated the long-standing principles of real property law and the state's recording statutes.  Hence, the borrowers and the public at large are paying an enormous price for the profits reaped by this scheme, not to mention robbing the states of their properties, transfer and excise tax revenues.

132. Unknown to the Plaintiffs or the general public, MERS had succeeded in monopolizing the mortgage, mortgage registry and foreclosure industry to the point where a financial spat in August 2008 terminated the access of Ocwen Loan Servicing, LLC ("Ocwen"), one of the nation's largest mortgage servicers, to the "MERS System," "an electronic platform used to record and transfer interests in tens of millions of mortgages secured by property throughout the United States."[25]

133. Ocwen pleaded for a TRO and stated in its introduction on page 1 that without access to MERS monopolistic powers, Ocwen simply could not compete:

---

[25]  **Ocwen v. MERS**, Complaint For Declaratory Judgment, Temporary Restraining Order And Preliminary And Permanent Injunction, And Damages, Case 1:08-cv-00824; a copy can be found at http://www.scribd.com/doc/45932985/Ocwen-v-MERS (visited 3/21/11)

"MERS seeks to use its monopoly power and its exclusive control over access to mortgages registered on the MERS System to force Ocwen to choose between paying an amount it does not owe, on the one hand, and facing continued exclusion from the MERS System, on the other. Ocwen's exclusion from the MERS System without the due process guaranteed in MERS's Terms and Conditions, if allowed to persist, will reduce competition significantly in the market for mortgage servicing by eliminating one of the nation's largest mortgage servicers. Without access to MERS, Ocwen cannot compete because it will be denied access to a business element necessary for effective competition."

**134.** Ocwen acknowledged that there was no alternative to MERS and that by 2006 MERS had over 45 million mortgages under its control.  In paragraph 38, Ocwen detailed how detrimental it was to be a part of the MERS monopoly:

"With respect to mortgages registered on the MERS System, MERS is the sole source of assignments and other legal documents necessary to transfer servicing, foreclose on defaulted mortgages, and perform other servicing functions. **MERS thus is a monopolist with respect to mortgages registered on the MERS system, inasmuch as there is no competing registry from which the documents necessary to service those mortgages can be obtained.** Given the lack of any alternative registry, MERS controls access to a business element that is necessary for effective competition. Without access to the MERS System, Ocwen has no ability to provide its services to the detriment of competition and the market." (emphasis added)

Ocwen continued in ¶39 to point out the monopoly share of the market MERS controlled in 2006 that figure continued to grow until 2008:

"MERS also has market power in the broader industry. As of late 2006, more than 45 million mortgages were registered on the MERS System. This represented more than 60 percent of new loan originations in the United States

and more than 30 percent of the total outstanding mortgage debt in the nation. On information and belief, this market share has increased since 2006."

135. Ocwen outlined precisely and described the control MERS had on the mortgage servicing functions:

"Essential mortgage servicing functions that depend on information stored in the MERS electronic registry include:

a.   Providing borrowers with accurate information concerning the current ownership of their mortgage loans;

b.   Protecting lenders' and investors' interests in properties securing mortgage loans by initiating loss mitigation procedures including, where necessary, foreclosure proceedings;

c.   Accurately and efficiently managing the transfer of servicing rights between Ocwen and other mortgage servicers; and

d.   Facilitating the resolution of issues created by borrower's economic distress through loan modification agreements and other payment plans requiring approval of the record owner of the subject mortgage."

136. MERS and its cartel of members controlled nearly all aspects of mortgage origination, registry and foreclosure from fixed costs and fees to methodology.

137. MERScorp and its members operated for shared profits. Each and every transaction had a fixed cost clearly set forth on the MERS website. Costs and fees including recordation, assignment and legal were fixed among the membership and transmitted in addition to the Rule changes, Policy, Training and Announcements and posted regularly in Bulletins on the MERS

website.[26]

**138.** MERS had such control of its membership that when disclosure issues began to heat up in courts across the country, MERS made an across the board policy change because it apparently felt the need to appear more transparent. On or about Friday, July 16, 2010, "MERSCORP, Inc. (MERS) announced today that investor information for loans registered on the MERS® System is now available to borrowers at no charge."[27] Apparently, prior to July 16, 2010, nearly 13 years after the inception of MERS and MERScorp, the policy became necessary because MERS was not transparent.

**139.** Not all investors had to avail their identity as MERS allowed for further anonymity by adding to the Press Release:

> "The expanded MERS InvestorID program is an opt-out system which displays investor information on all MERS-registered loans unless the investor has specifically opted out of disclosure (servicer information will continue to be displayed). If a borrower wishes to find the investor on a loan with an opted-out investor, they can do so by sending a written request to their servicer for the information."

---

[26]   **MERS Bulletins** at http://www.mersinc.org/MersProducts/bulletins.aspx?mpid=4 (last visited 3/21/11).

[27]   **MERS Expands Website To Disclose Loan Investor Information**, at http://www.mersinc.org/newsroom/press_details.aspx?id=241 "Now both servicer and investor information are readily available to the public," said Arnold. "Consumers and lenders want and need greater transparency and that's what MERS is delivering."

**140.** The way that MERS circumvents the state's recording statutes is as follows: In mortgages, MERS is named as "nominee" for the lender (arguably a form of agency). It is often the entity recorded in the state recordation office as being the original mortgagee. MERS claims that this "inoculates" the mortgage against future assignments because MERS remains the nominal mortgagee "no matter how many times servicing is traded."[28] Tracking subsequent assignments of mortgage happens strictly within the MERS databases.

**141.** "Because MERS remains the mortgagee of record in the public land records throughout the life of the loan; it eliminates the need to record later assignments in the public land records. MERS does not create electronic assignments; it eliminates subsequent recordation and assignments altogether. After MERS becomes Mortgagee, there are no more assignments, except on the rare occasion when a Member wants an assignment from MERS."[29]

**142.** A typical clause naming MERS in a mortgage is as follows:

---

[28] Id., "**About MERS**," MERScorp, Inc. www.mersinc.org/about/index.aspx. (Last viewed 1/21/11).

[29] *R.K. Arnold, **"Yes, There is Life on MERS®"** Real Estate Law, ABA Network, Spring 1998, Vol. 2, No. 1. at* http://www.abanet.org/genpractice/magazine/1998/spring-bos/arnold.html. (Last visited 1/21/11).

> *"MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as nominee for Lender and Lender's successors and assigns.  MERS is the mortgagee under this Security Instrument."*

143. Recent legal challenges have questioned the legal inconsistencies in MERS' roles: as "nominee" (arguably "agent") and also as "mortgagee," i.e., the owner of the real property right to foreclose. An entity can not be both an agent and a principal with respect to the same right. Further, upon information and belief, the State of Hawaii has never authorized MERS to make changes to the state's real property recording statutes.

144. Plaintiffs argue that the MERS "nominee" status and the rights bestowed upon MERS within the Mortgage itself, are insufficient to empower MERS to effectuate a valid assignment of mortgage, even if it were today to assign the mortgage in default to ASB.

145. The inability to make a valid assignment thereby clouds the title of Plaintiffs' property.

**MERS IN NOT AN AGENT**

146. In a 2006 published opinion, the New York Court of Appeals described MERS system as follows:

> "In 1993, the MERS system was created by several large participants in the real estate mortgage industry to track ownership interests in residential mortgages.  Mortgage lenders and other entities, known as MERS members, subscribe to the MERS system and pay annual fees for the electronic processing and tracking of ownership and transfers of mortgages.  Members contractually agree to

appoint MERS to act as their common agent on all mortgages
they register in the MERS system.
The initial MERS mortgage is recorded in the County
Clerk's office with 'Mortgage Electronic Registration
System, Inc.' named as the lender's nominee or mortgagee
of record on the instrument.  During the lifetime of the
mortgage, the beneficial ownership interest or servicing
rights may be transferred among MERS members (MERS
assignments), but these assignments are not publicly
recorded; instead they are tracked electronically in
MERS's private system.  In the MERS system, the mortgagor
is notified of transfers of servicing rights pursuant to
the Truth in Lending Act, but not necessarily of
assignments of the beneficial interest in the mortgage."
*Merscorp, Inc., v. Romaine*, 8 N.Y.3d 90 (N.Y. 2006)
(footnotes omitted).

   **147.** There is little to no case law in the State of Hawaii

that interprets the role and legal status of MERS.  Recently

however, a New York Bankruptcy Court set forth a detailed

analysis of the role of MERS because "MERS's role in the

ownership and transfer of real property notes and mortgages is

at issue in dozens of cases" (*In re Ferrel L. Agard*, Bkrtcy. No.

810-77338-reg (D.N.Y.) at *19).  The Court stated that:

   Other than naming MERS as "nominee", the Mortgage also
   provides that the Borrower transfers legal title to the
   subject property to MERS, as the Lender's nominee, and
   acknowledges MERS's rights to exercise certain of the
   lender's right under state law.  This too, is insufficient
   to bestow any authority upon MERS to assign the mortgage.
   In Bank of New York v. Alderazi, the court found "[t]he
   fact that the borrower acknowledged and consented to MERS
   acting as nominee of the lender has no bearing on what
   specific powers and authority the lender granted MERS."
   Alderazi, 900 N.Y.S.2d at 824.  Even if it did bestow some
   authority upon MERS, the court in Alderazi found that the
   mortgage did not convey the specific right to assign the
   mortgage.

   **148.** In Agard, MERS lost its argument that it had authority

to act as "agent" for each and every MERS member who claims ownership of a note and mortgage registered in its system.  This authority was purportedly based on the terms and conditions of a MERS membership agreement.  Those terms and conditions provide that "MERS shall serve as mortgagee of record with respect to all such mortgage loans solely as nominee, in an administrative capacity, for the beneficial owner or owners thereof from time to time." (<u>Agard</u>, at 26).

**149.** Under Hawaii agency laws, an agency relationship arises when "one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." *Restatement (Third) of Agency § 1.01.*  Further, "[i]t is well established that '[a]n agency relationship may be created through actual or apparent authority.'" (*State Farm Fire & Cas. Co. v. Pac. Rent-All, Inc.*, 90 Haw. 315, 325, 978 P.2d 753 (1999) (quoting *Cho Mark Oriental Food, Ltd. V. K & K Int'l*, 73 Haw. 509, 515-16, 836 P.2d 1057, 1061-62 (1992)).

**150.** Actual authority exists "only if there has been a manifestation by the principal to the agent that the agent may act on his account and consent by the agent so to act, and may be created by express agreement or implied from the conduct of the parties or surrounding circumstances." *State Farm*, 90 Haw.

At 325, 978 P.2d at 763 (quoting from *Cho Mark*, 73 Haw. At 515-16, 836 P.2d at 1061-62). Express actual authority "requires an oral or written agreement between the parties that the principal has delegated authority that the agent has accepted and that authorizes the agent to do certain things." *Cho Mark*, 73 Haw. At 515-16, 836 P.2d at 1061-62.

151. Because MERS's members, who are the alleged beneficial noteholders, purported to bestow upon MERS interest in real property sufficient to authorize the assignments of mortgage, the alleged agency relationship must be committed to writing by application of the statute of frauds.

152. Plaintiffs submit that neither the Mortgage, nor any other loan document which has been provided to Plaintiffs, evidences an agency relationship between MERS and ASB.

153. In the absence of such express authorization, Plaintiffs submit that their Mortgage with MERS as mortgagee is damaged by a clouded title that cannot be remedied by ASB without the admission of the damages it heaved upon the Plaintiffs, and is now using foreclosure to cover the trail of misrepresentation and deception.

154. As a consequence, Plaintiffs further submit that ASB has bifurcated their note and mortgage to the destruction of the very purpose of their loan contracts.

**ASB Did Not Effectively Transfer Plaintiffs' Original Note Thereby Ensuring a Clear Chain in Title to Plaintiffs' Mortgage**

155. Two documents relating to each mortgage loan must be validly transferred together. The rules that govern these transfers are contained in Hawaii's Uniform Commercial Code ("UCC").

156. The right to enforce a promissory note can be transferred only by physical delivery of the original note. Under HRS § 3-301[30] and § 3-301 of the Uniform Commercial code ("UCC"), a "person entitled to enforce" an instrument means (with certain exceptions not relevant in this case) either "the holder of the instrument" or "a nonholder in possession of the instrument who has the rights of a holder." Thus, HRS §3-301 ties the enforcement right to possession of the paper.

157. Section 3-302(a) of the UCC provides that "an instrument is transferred when it is *delivered* by a person other than its issuer for the purpose of giving to the person receiving delivery the right to enforce the instrument." Under these sections, no one can enforce (and hence, no one can foreclose a mortgage secured by) a negotiable note unless the note and the mortgage have been delivered to that person.

158. It is unclear when and if ASB actually transferred or

---

[30]   HRS §3-301 can be found at http://www.capitol.hawaii.gov/hrscurrent/Vol11_Ch0476-0490/HRS0490/HRS_0490-0003-0301.htm

*delivered* the promissory note to MERS for the foreclosure
proceeding.  If there was no transfer of the note then MERS
committed a fraud upon the bankruptcy court by alleging it had
standing to foreclosure on Plaintiffs' mortgage.  The reverse is
true for ASB and in this case, in addition to the delivery of
the note back to ASB, no assignment of the mortgage had been
made by MERS to ASB.

159.  Pursuant to the UCC (HRS §§ 490:3-204) the promissory
note and security instrument (mortgage) must be transferred by
indorsement (in the same way that a check may be transferred by
indorsement) or by sale.  Further, the UCC requires that the
holder have physical possession of the original, manually signed
note in order for the loan to be enforceable by the holder
against the borrower in case of default (HRS §§ 490:3-201-203).

**FACTS COMMON TO PLAINTIFF'S CLAIMS FOR SLANDER OF TITLE, QUIET
TITLE, AND INJUNCTIVE RELIEF**

160.  With reference to MERS's role in Plaintiffs' mortgage
loan transaction, the Mortgage states:

> MERS is a separate corporation that is acting
> solely as a nominee for Lender and Lender's
> successors and assigns.  MERS is the mortgagee
> under this Security Agreement (Mortgage, Exhibit
> "2", P. 2).

161.  The Mortgage also purports to contain a transfer to
MERS of Plaintiff's rights in the Subject Property as follows:

> This Security Instrument secures to Lender: (i)
> the repayment of the Loan, and all renewals,

extensions and modifications of the Note; and
(ii) the performance of Borrower's covenants and
agreements under this Security Instrument and
the Note. For this purpose, Borrower does hereby
mortgage, grant and convey to MERS (solely as
nominee for Lender and Lender's successors and
assigns) and to the successors and assigns of
MERS, with power of sale, the [Subject
Property].

Borrower understands and agrees that **MERS holds
only legal title to the interests granted by
Borrower in this Security Instrument**, but, if
necessary to comply with law or custom, MERS (as
nominee for Lender and Lender's successors and
assigns) has the right: to exercise any or all
of those interests, including, but not limited
to, the right to foreclose and sell the
Property; and to take any action required of
Lender including, but not limited to, releasing
and cancelling this Security Instrument.
(Exhibit "2A", PP. 3)(emphasis added).

162. Plaintiffs' did not knowingly enter into the loan
application and negotiation of a mortgage with ASB with the
understanding that ASB was a member of MERS.  Nor was there, at
any time prior to the signing of the mortgage loan on December
17, 2007, disclosure that MERS would be the mortgagee.

163. Nowhere in the Fannie Mae and Freddie Mac mortgage
loan form documents, including the HUD and TILA statements, is
there a definition of "nominee" and how it applies to the
Plaintiffs as borrowers.

164. Plaintiffs did not agree to split apart their mortgage
and note for the convenience of the lender to securitize the
mortgage documents at will.

165. Plaintiffs did not agree to allow MERS to hold their mortgage and silently record the alter ego activity of ASB.

166. The bifurcation of the Plaintiffs' mortgage and the note was deliberately and disingenuously designed to reduce ASB's exposure, accountability and liability of carrying a mortgage. A mortgagee in possession will have responsibility for management and preservation of all the collateral in its custody, thus the mortgage becomes a liability.

167. However, in the case of MERS, the transparency of liability is as clouded as the Plaintiffs' mortgage by the introduction of a new language using nominee, "solely as nominee holding legal title" are examples covering the fact that the mortgage liability is on someone else's books other than ASB.

168. In general, a mortgage is unenforceable if it is held by one who has no right to enforce the secured obligation. Restatement (Third) of Property, Mortgages § 5.4 cmt. e. The separation of the obligation from the mortgage results in a practical loss of efficacy of the mortgage. *Id*. cmt. a.

169. MERS and ASB intentionally split the obligation and the mortgage deed. This split was necessary to create the MERS system and facilitate the growth of the secondary mortgage market.[31]

---

[31] See ***Mortgage Electronic Registration System***, Phyllis K. Slesinger & Daniel Mclaughlin, 31 IDAHO L. REV. 805, 818 fn.2

**170.** When the right of enforcement of the note and the mortgage are split, the note becomes, as a practical matter, unsecured. This result is economically wasteful and confers an unwarranted windfall on the mortgagor. *Id*. cmt. a.

**171.** Restatement (Third) of Property, Mortgages § 5.4 cmt. e. Mortgage may not be enforced except by a person having the right to enforce the obligation or one acting on behalf of such a person. As mentioned, in general a mortgage is unenforceable if it is held by one who has no right to enforce the secured obligation. For example, assume that the original mortgagee transfers the mortgage alone to A [MERS] and the promissory note that it secures to B [ASB]. Since the obligation is not enforceable by A [MERS], A [MERS] can never suffer a default and hence cannot foreclose the mortgage. B [ASB], as holder of the note, can suffer a default. However, in the absence of some additional facts creating authority in A [MERS] to enforce the mortgage for B [ASB], B [ASB] cannot cause the mortgage to be foreclosed since B [ASB] does not own the mortgage. *Id*. cmt. e.

**172.** The Defendants' scheme has placed them in a precarious entanglement where neither Defendant can legally recover without the admission of intentional bad acts.

---

(stating "[f]or mortgages sold into the secondary market, legal title and equitable ownership are commonly severed. Mortgage servicers retain bare legal title to facilitate mortgage servicing; equitable interests are transferred to the investor.").

## CLAIM I

### VIOLATIONS OF THE SHERMAN/CLAYTON ANTI-TRUST ACTS

(Against Defendants ASB, MERS, MERScorp and DOES 1-20)

**173.** The allegations contained in the preceding paragraphs of this Complaint are incorporated herein by reference.

**174.** The anti-competitive behavior of the Defendants is demonstrated by the agreement to fix fees, costs and policies dictated by MERS and its members, as more fully described hereinabove. A summary of facts include:

**ANTITRUST FACTS**

1. MERS started with goal of owning 100% of digital recording of real estate ownership;

2. MERS has succeeded it controls 100% of digital recording. The admitted goal was a monopoly which has been achieved;

3. MERS was created as a membership organization evidencing an intent to cooperate in achieving higher income rather than competing for profit;

4. MERS was sued in federal court by Ocwen the allegation was that MERS had kicked Ocwen out of MERS in a dispute over fees. Ocwen alleged that MERS was a successful monopoly and that Ocwen could not successfully compete without being a member of MERS the suit settled an Ocwen is once again a member of the monopoly;

5. The big banks beginning with the creation of MERS, up and until the collapse, showed dramatic increases in profits far beyond what could be achieved without collusion;

6. The total income of all MERS members' financial institutions increased dramatically;

7. Rather than compete about elements of foreclosure for at least two years almost all banks belonging to MERS foreclosed through MERS rather than compete;

8. MERS and its members controlled and monopolized all aspects of mortgage origination, registry and foreclosure from fixed costs and fees to methodology.

9. All members of MERS for years paid the same fee amounts through MERS for foreclosure using the same attorneys who, by ignoring the requirements for proper foreclosures, have clouded millions of titles;

10. Under pressure from the big banks MERS negotiated contracts for foreclosure which did not provide adequate funding to the lawyers to actually examine all of the documents to insure that foreclosure could properly be done;

11. All of the big banks agreed tacitly or explicitly to ignore the details in the proper securitization of loans beginning in 2002 all major lenders / securitizers were well aware that their bank and other large banks were out of control with regard to lending abuses;

12. Under pressure to provide more transparent information about investors and servicers, MERS members merely agreed to have the identical policy change on the same day as MERS announced on behalf of all its members that this new policy was now in place through a MERS press release;

13. All MERS members follow MERS rules with regard to foreclosure;

14. All MERS members have access to all MERS members' homeowner data stored on MERS system.

**175.** Plaintiffs Fitzgerald and Parsons upon information and belief and on that basis allege that Defendants ASB and MERS, along with large private banking institutions operating within the United States sued as DOES 1-20 (collectively "the Big

Banks"[32]), agreed, beginning in or about 1994, to a scheme by which they would and did set up the monopolization of a private system of recording interests in land throughout the United States, that would give them a competitive advantage over smaller banking institutions to fly freely under the regulator radar transferring mortgage loans among other "member" banks and into securitized pools of like mortgages; this system became known as "MERS", with over 4000 members.[33]

176. Plaintiffs Fitzgerald and Parsons are further informed and believe and on that basis allege that subsequent to the creation of MERS, the Big Banks and ASB by participation used their combined market power in the financial industry to take control of the market for private securitization of mortgages, to the virtual exclusion of smaller banking institutions, such that virtually all privately securitized mortgage loans are in trust to or serviced by the "membership."

177. Plaintiffs Fitzgerald and Parsons upon further information and belief and on that basis allege that subsequent to the creation of MERS, the Big Banks and ASB by participation

---

[32]    The Big Banks and partners included, but were not limited to, Bank of America, JP Morgan Chase, Citibank, Wells Fargo, Morgan Stanley, Goldman Sachs, FHLB, Fannie Mae, Freddie Mac, Deutsche Bank, that shared information and duties.

[33]    MERS Comments to the SEC: "Over 3000 MERS members have registered more than 65 million loans on the MERS® System" http://www.sec.gov/comments/s7-08-10/s70810-58.pdf (last visited 1/21/11)

were able to and did control the administration and servicing of virtually all private securitization of pooled mortgages and the capital they generated, such that other smaller banking institutions of the United States have been virtually "shut out" from private sources of capital for funding residential mortgage loans, unless they were willing to join into the MERS system, and sell the mortgages they originated into the mortgage pools set up and controlled by the Big Banks, such that those institutions are denied the benefits generated by such mortgages and the income generated from servicing those mortgages.

178. Plaintiffs Fitzgerald and Parsons upon information and belief and on that basis allege that subsequent to the creation of MERS, smaller banking institutions in the United States have been virtually forced out of the residential lending market, if they, unlike ASB, refused to participate in the securitization scheme.

179. Plaintiffs Fitzgerald and Parsons upon information and belief and on that basis allege that subsequent to the creation of MERS, the Big Banks and MERS used their control over the residential mortgage market by inflating the market for residential properties in the United States and thereby increasing the proportionally-based fees that such larger loans would generate.

180. Such inflation manifested itself in a complete

inversion of the order of mortgage loan creation and securitization. The Big Banks' and ASB's desire for more profit led to a system in which a security instrument would be created and marketed to investors prior to any loan being originated. The security would be tailored to consist of mortgages of certain specified sizes, features, and risk levels.  It would be only after the security was sold to investors with "place holder" and "bogus" assets that the Big Banks would send out "orders" for mortgage loans that met the criteria set forth in the security's prospectus.

181. Until the collapse, ASB knew through its membership participation it had access to the securitization of MBS trusts if it so desired.

182. The "orders" would be transmitted to participating loan originators.  The originators would be "encouraged" to make loans of the type specified in the orders, since those loans were the ones most likely to be purchased and securitized.

183. The originators would then be under pressure to structure such loans to their customers, regardless of the customers' needs.  Given that the Big Banks virtually controlled the market in loans, those originators would steer customers toward those loans, and either fail to mention or steer customers away from loans that might be otherwise more appropriate.

184. Because larger loans generated larger fees, the originators would steer customers toward larger loans with promises of real estate investment growth, equity and credit lines under the false perception that the customers could maintain the loans. Under the former traditional residential loan model in the United States, lenders had tremendous financial incentive to only issue loans under a safe economic condition. ASB took advantage of this process and did not disclose to the borrowers that this business model and the economic conditions had changed.

185. The Big Banks and ASB had an iniquitous advantage of shared information that was a window of unfair opportunity allowing them to view the borrowers' financial status, deposits on hand, debts, and present and future income that they used to structure and absorb as much cash as possible for fees, costs, interest; rather than a regulated standardized methodology.

186. In order to facilitate the granting of larger loans, the Big Banks developed loan products and guidelines that did not depend on proof of a borrower's income, but rather depended on the value of the real property secured by the loans and the borrowers' credit scores.

187. In order to justify the granting of larger loans, pressure was brought to bear upon property appraisers: those who would not "hit the number" (appraise a property at a value that

the lender wanted to lend) would not be given further business.

188. As the result of the acts described above, the Big Banks and ASB were able to increase the size of loans they made, bought, and securitized, allowing them to take their gains and redeploy them into even larger securities, and in the process were able to inflate the prices of residential real property and sold borrowers on the promise that like stock, as their property values escalated they could continue to pull more equity out. This activity was to a point where the loans they selling were inflated far beyond the actual market value and increasing at rates well beyond the annual average, according to the lending standards they themselves had developed and used for decades. In the end it became apparent that as the Big Banks and their pals were allowed to run amok, they wrote more loans than they could all handle.

189. Plaintiffs Fitzgerald and Parsons upon information and belief and on that basis allege that ASB and the Big Banks knew that such a business that depended upon ever increasing real estate values was unsustainable, and purposely created and used MERS to serve as a "firewall" between themselves, the loan originators, the regulators and the borrowers they were routinely pulling into unsustainable debt.

190. Plaintiffs Fitzgerald and Parsons upon information and belief and on that basis allege that ASB and the Big Banks also

depended upon MERS to give them a quick and efficient way of
rationalizing the interests they would need to secure interests
in the real property, whether or not such rationalizations
reflected the true relationship between lender and borrower,
once their scheme of mortgage manipulation had reached investors
the natural and inevitable inclination was to sue the Big Banks
for inflated pricing, overrated mortgage loans and relaxed
underwriting processes.  At the point of lawsuit saturation,
corporate investors imparted layoffs and pay-cuts to compensate
for loss securities investments, real estate prices began to
fall, and borrowers fell into financial distress.

191. Plaintiffs Fitzgerald and Parsons upon information and
belief, and on that basis allege that in an effort to generate
more money to settle with investors the Big Banks also created
securities generally known as credit default swaps (CDSs),
insured them and took positions against the mortgage securities
they created, in effect betting against the very subprime home
loan borrowers they had sought to entice into loans on
constantly appreciating residential real property, knowing that
the market had collapsed and that those borrowers would
eventually be unable to meet those inflated obligations that the
Big Banks had endeavored to create.

192. Plaintiffs Fitzgerald and Parsons upon information and
belief, and on that basis allege that Defendant ASB, (a) knew of

and acquiesced to the creation of MERS by the Big Banks, the
shared fee schedules and actively used MERS to facilitate the
creation of its own private label[34] mortgage loan securities; and
(b) knew of the acts of the Big Banks described above in
inflating the mortgage market, and knowingly and willfully
accepted the benefits of such an inflated market in the form of
increased closing costs and fees for servicing residential
mortgage loans and residential mortgage securities.

**193.** Plaintiffs Fitzgerald and Parsons upon information and
belief, and on that basis allege that Defendant ASB approved the
inclusion of MERS as mortgagee and "nominee" for the Mortgage as
part of the rules between Defendant ASB as a "member" of MERS,
MERS itself, and the Big Banks, sued here as DOES 1-20,
inclusive, to:

  (a)   protect and insulate Defendant ASB from otherwise
        valid claims and defenses by mortgagors and borrowers
        by providing an intermediary in the transaction;

---

[34] At the time of the Debtor's loan in December 2007, and "as of
December 31, 2007, ASB had an investment in Federal Home Loan
Bank ("FHLB") of Seattle stock of $98 million." This is
important because ASB's principal sources of borrowings are
advances from the FHLB and securities sold under agreements to
repurchase from broker/dealers. ASB utilizes deposits, advances
from the FHLB and securities sold under agreements to repurchase
to fund maturing and withdrawable deposits, repay maturing
borrowings, fund existing and future loans and purchase
investment and mortgage-related securities. As of December 31,
2007, ASB had commitments to borrowers for undisbursed loan
funds, loan commitments and unused lines and letters of credit
of $1.2 billion. Source: HEI 2007 Annual Report, p.46. FHLB is
the money warehouse for ASB.

(b)     operated, conspired and shared information through the membership organization of MERS, where fees and costs were fixed and a sets of rules and manuals were required to be followed by all or lose access to the only national registry system and the ability to effectively operate business;

(c)     provide a conduit for the securitization, and exclusive access to the business of servicing securitized mortgage loans and DOE Defendants 1-20;

(d)     collectively form and join MERS to monopolize the electronic mortgage registry system throughout the United States to the detriment of the state recordation processes and the clouded titles of the borrowers;

(e)     essentially hide the liability of the Plaintiffs' mortgage in Defendant's accounting procedures;

(f)     eliminate competition in the real residential loan industry in that consumers are offered only loans that conform to the preset parameters of securitization pools, and cannot obtain loans that more closely fit their particular needs, and

(g)     obstruct the Plaintiffs' ability to obtain a modification or payment plan on the loan even during a financial equivalent to force majeure.

**194.** Defendants' conduct, as described above violates the Sherman Anti-Trust Act, 15 U.S.C. §§ 1 and 2.

**195.** As the result of the conduct of Defendants ASB, MERS, and DOES 1-20 described above, Plaintiffs Fitzgerald and Parsons have been damaged by the monopolization of the electronic registry of mortgages perpetrated upon the United States in an effort and stated goal to control 100% of America's mortgages, in that they have been subject to:

a)    the loss of property value, business and cause of bankruptcy due, to the economic collapse as a result of the Defendants' securitization scheme;

b)    the damage of clouded title and personal credit;

c)    the loss of investment and savings;

d)    Defendant ASB's refusal to consider modification because they no longer hold or control the mortgage, in addition to the burden and inability of maintaining the numerous loans they wrote and disingenuously shared with MERS outside of normal accounting procedures;

e)    the imposition of artificially high appraisal values, mortgage rates, fixed closing costs and fees for mortgage  servicing, without any meaningful choice, and without any opportunity to bargain for more advantageous fees, such costs and fees being added to any balance due to the mortgagee in the event of default;

All of the above is inconsistent with a system of free and fair trade guaranteed to all persons, and the restraint of which is prohibited by the Sherman and Clayton Anti-Trust Acts, 15 U.S.C. § 2 et seq.

**196.** Section 4 of the Clayton Antitrust Act, codified at 15 U.S.C. §15, provides as follows:

"[A]ny person who shall be injured in their business or property by reason of anything forbidden in the antitrust laws may sue therefore in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

Plaintiffs Fitzgerald and Parsons allege they are such persons injured in their persons and property and are,

therefore, entitled to bring an action against Defendants for Defendants' actions complained of above.

197. As a direct and proximate result of the unlawful conduct of Defendants  ASB, MERS, DOES 1-20, and each of them, in monopolizing or attempting to monopolize the mortgage lending and servicing market, Plaintiffs Fitzgerald and Parsons have suffered pecuniary damages in an amount to be determined, and subject to treble augmentation.

198. Plaintiffs Fitzgerald and Parsons have also been required to retain legal counsel and, therefore, request that Defendants be required to pay Plaintiffs' attorney fees and costs necessary to pursue their legal and just claims, pursuant to 15 U.S.C. §15.

## CLAIM II

### VIOLATIONS OF THE HAWAII ANTI-TRUST/ANTI-MONOPOLY ACTS

(Against Defendants ASB, MERS, MERScorp and DOES 1-20)

199. The allegations contained in the preceding paragraphs of this Counterclaim are incorporated herein by reference.

200. Mortgage lending and servicing in Hawaii is an activity in or affecting interstate commerce under Section 2 of the Sherman Act, as the parties traffic in personal service to foreigners and rely on foreign goods for their businesses.

201. The conduct of Defendants ASB, MERS and DOES 1-20, and each of them, as described more fully above, violates the Hawaii

Monopolization Act, Hawaii Revised Statutes § 480-9.

202. As a direct and proximate result of the unlawful conduct of Defendants ASB, MERS and DOES 1-20, and each of them, in monopolizing or attempting to monopolize the mortgage lending and servicing market, Plaintiffs Fitzgerald and Parsons have suffered pecuniary damages in an amount to be determined at trial.

203. Plaintiffs Fitzgerald and Parsons have also been required to retain legal counsel and, therefore, request that Defendants, ASB, MERS and DOES 1-20, and each of them, be required to pay Plaintiffs' attorney fees and costs necessary to pursue their legal and just claims, pursuant to Hawaii Revised Statutes § 480-9.

## CLAIM III

### MISREPRESENTATION

(Against Defendants ASB, Ioane, and Lau)

204. The allegations contained in the preceding paragraphs of this Complaint are incorporated herein by reference.

205. As set forth above, on or about December 17, 2007, Defendant ASB made loans secured by the subject property to Plaintiffs Fitzgerald and Parsons.

206. At the time it made the loan to Plaintiffs Fitzgerald and Parsons, Defendant ASB represented that Plaintiffs would be able to obtain a credit line of $200,000.00 with Defendant ASB

when they completed construction.

207. When the construction was completed Plaintiffs reminded the ASB loan officer about the credit line and were asked to complete another application.  Plaintiffs complied and ASB never responded to the application request, nor provided the credit line.

208. At the time it made the loan to Plaintiffs Fitzgerald and Parsons, Defendant ASB represented that Plaintiffs would pay interest of 6.25%.

209. Defendant ASB created an ambiguous mortgage note document that stated **"six and one quarter percent (6.625%)."**

210. Defendant ASB used all Fannie Mae and Freddie Mac forms prior to, during and after the consummation of the mortgage loan and falsely led Plaintiffs to believe that their loan was to fall under government regulated guidelines.

211. Plaintiffs Fitzgerald and Parsons are informed and believe that because of its participation in the scheme to control and stifle competition in the residential mortgage loan industry described above, Defendant ASB knew or should have known that by December 17, 2007 the mortgage industry was collapsing the economy as they indicated in the HECO Annual Reports and by the full documentation that the Plaintiffs provided for the loan, that Plaintiffs' income derived from construction and housing would certainly be negatively impacted.

212. At the aforementioned time it made those loans to Plaintiffs Fitzgerald and Parsons, Defendant ASB did not disclose to Plaintiffs that MERS would be their mortgagee essentially separating the mortgage from the note and creating an inability to effectively communicate or negotiate with the entity in control of the mortgage.

213. ASB intentionally misrepresented the actual mortgagee and mortgage by creating an ambiguous document.

214. As a result of the mortgagee misrepresentation, Defendants Ioane and Lau made material misrepresentations to the Plaintiffs' bankruptcy court severely impacting Plaintiff including, but not limited to, attorneys' fees and costs.

215. Plaintiffs Fitzgerald and Parsons relied upon the representations made to them by Defendant ASB, and that those representations were a full and complete disclosure of Defendant's policies and practices with regard to making loans on the Subject Property.

216. Had Plaintiffs Fitzgerald and Parsons known of Defendant ASB's true intention to arbitrarily deny them the opportunity to refinance or modify their loans in the event of an emergency or catastrophe, or protect them from the conversion of the bonded funds, Plaintiffs would not have entered into the loan transactions.

217. As the result of Defendant ASB's misrepresentation of

material fact set forth above, Plaintiffs Fitzgerald and Parsons
are entitled to, and thus seek, damages as a result of their
associated loan transactions.

218. As a further direct and proximate result of Defendant
ASB's misrepresentations of material fact set forth above,
Plaintiffs Fitzgerald and Parsons have been damaged in an amount
to be established at trial.

219. Defendant ASB's acts, as set forth above, were
intentional, made with the intent to harm Plaintiffs Fitzgerald
and Parsons, and conducted in conscious disregard of Plaintiffs'
rights.  Such acts constitute malice, and warrant the award of
exemplary damages in an amount to be established at trial.

### CLAIM IV

#### UNFAIR AND DECEPTIVE ACTS OR PRACTICES

(Against Defendant ASB, Ioane, Lau, MERScorp and MERS)

220. The allegations contained in the preceding paragraphs
of this Complaint are incorporated herein by reference.

221. Plaintiffs Fitzgerald and Parsons are "consumers" as
that term is defined in HRS § 480-1.

222. The described acts and practices of making and
servicing mortgage loans involved "trade or commerce" as that
term is used in HRS § 480-2(a).

223. An unfair or deceptive act or practice (UDAP) in the
conduct of any trade or commerce is unlawful pursuant to HRS §

480-2(a).

224. Certain deceptive trade practices are also unlawful pursuant to HRS §481A-3.

225. ASB and MERS failed to disclosure the nature or relationship of MERS to the borrowers' mortgage prior to signing the loan documents.  The Plaintiffs were unaware that they were making a mortgage loan agreement with anyone other than ASB and had no prior notification or information in order to perform due diligence with respect to MERS.

226. ASB and MERS failed to define the terminology used in the contracts relating to MERS making the mortgage documents ambiguous needing legal interpretation.

227. In connection with the subject loan, Defendant ASB engaged in UDAPs that violate HRS § 480-2(a) and/or 481A-3, including but not limited to:

     a.    Targeting financially unsophisticated and otherwise vulnerable consumers for inappropriate financial schemes;

     b.    Offering a credit line as bait and then failing to address the promise after the loan was completed;

     c.    Failing to adequately disclose the true nature of MERS, the costs and risks associated with the intended bifurcation of the note and mortgage and its/their inappropriateness for Plaintiffs;

     d.    Failing to protect the Plaintiffs' construction loan funds when the bonding company manipulated the construction draw funds;

e. Falsely representing MERS as holder of the note in a position to foreclose in Parsons' bankruptcy;

f. Falsely using Fannie Mae and Freddie Mac mortgage loan forms, HUD statement forms and appraisal forms to create the perception of a federally insured loan program;

g. Making false statements regarding the documents in the possession of MERS and/or ASB;

h. Making a loan on a property at the time when the bank was experiencing high losses due to the sale of risky and deflated mortgage-backed securities, yet

i. Continuing to use MERS to hold/hide the mortgage while the bank collected cash downpayments and closing costs from the Plaintiffs.

228. Defendant ASB's actions in connection with the subject loans constitute UDAPs in violation of HRS §§ 480-2(a), 481A-3, or both.

229. Defendant ASB's conduct caused Plaintiffs Fitzgerald and Parsons to suffer injury to their use and enjoyment of the property, including without limitation the clouded title created by the MERS factor.

230. MERS was a mere shell or holding pen for the mortgage liability with no attributes and/or known services provided to the detriment of the mortgagors.

231. Defendant ASB's above-described acts and practices offend established public policy and were immoral, unethical, oppressive, unscrupulous, and substantially injurious to

consumers and were, therefore, unfair in violation of HRS § 480-2(a).

**232.** Defendant ASB's above-described acts and practices involved material representations, omissions or practices that were likely to mislead consumers acting reasonably under the circumstances and were, therefore, deceptive in violation of HRS §§ 480-2(a), 481A-3 and 454M, or all of them.

**233.** Pursuant to HRS § 480-12, a contract or agreement in violation of HRS Chapter 480 is void and is not enforceable at law or in equity.  Plaintiffs thus seek reparation of the loan contract.

**234.** In the alternative, as a direct and proximate result of one or more of the foregoing acts and/or omissions of Defendant ASB, Plaintiffs have been damaged in an amount to be established at trial.

**235.** Plaintiffs Fitzgerald and Parsons have also been required to retain legal counsel and, therefore, request that the Defendant be required to pay Plaintiffs' attorney fees and costs necessary to pursue their legal and just claims, pursuant to Hawaii Revised Statutes § 480-9.

**CLAIM V**

**<u>BREACH OF FIDUCIARY DUTY</u>**

(Against Defendants ASB, MERScorp and MERS)

**236.** The allegations contained in the preceding paragraphs

of this Complaint are incorporated herein by reference.

**237.** Defendant ASB established fiduciary duty by controlling the Plaintiffs' construction bonding funds and specifically breached that duty by not protecting Plaintiffs from the bonding predator.

**238.** Defendant ASB had sufficient notification and specific request to intervene when the bonding company manipulated Plaintiffs' construction funds to the point of conversion. ASB's deliberate indifference to Plaintiffs' complaints created a domino effect that ultimately led to the Plaintiffs' bankruptcies and other damages in an amount to be determined at trial.

**239.** Defendant ASB, by contracting to, and representing it would provide mortgage loan services and a loan to Plaintiffs Fitzgerald and Parsons which they understood was not only meant to be best suited to their needs given their income and expenses but also would allow them to satisfy their obligations without risk of losing their property, was a "fiduciary" in which Plaintiffs Fitzgerald and Parsons reposed trust and confidence, especially given that they were not and are not an investment bankers, securities dealers, mortgage lenders, mortgage brokers, or mortgage lenders.

**240.** Defendant MERS, in agreeing to serve as "mortgagee" in the mortgage transaction, also was likewise a fiduciary, in whom

Plaintiffs Fitzgerald and Parsons placed similar trust and confidence as they did in Defendant ASB.

241. Defendant ASB breached its fiduciary duties to Plaintiffs Fitzgerald and Parsons by fraudulently inducing Plaintiffs to enter into a mortgage transaction which was contrary to Plaintiffs' stated intentions and interests, and by making a false representation as to its interest in the Property to benefit its own interests at Plaintiffs' expense.

242. Plaintiffs Fitzgerald and Parsons upon information and belief, and on that basis allege that Defendant MERS knew or should have known of Defendant ASB's breaches of fiduciary duties described above, did nothing to prevent them, and has done nothing to correct them, such actions in themselves being a further breach of fiduciary duty owed to Plaintiffs.

243. Plaintiffs Fitzgerald and Parsons upon information and belief, and on that basis allege that Defendant ASB breached its fiduciary duties to Plaintiffs by taking positions in the highly leveraged futures or options market, such interests were in direct opposition to Plaintiffs' interests and the general housing market as a whole.

244. As a direct and proximate result of Defendants ASB and MERS' breaches of fiduciary duties, Plaintiffs Fitzgerald and Parsons are entitled to damages in an amount to be established at trial.

**245.** Under the totality of the circumstances, the actions of Defendants ASB and MERS were willful, wanton, intentional, and undertaken with the conscious disregard for the Plaintiffs' rights.  Such actions warrant an award of exemplary damages to both punish and make an example of Defendants as to other persons or entities with similar inclinations.

### CLAIM VI

### UNJUST ENRICHMENT

(Against Defendant ASB)

**246.** The allegations contained in the preceding paragraphs of this Complaint are incorporated herein by reference.

**247.** Defendant ASB had an implied contract and warranty with Plaintiffs Fitzgerald and Parsons to ensure that they understood all fees, rates, payments and charges which would be paid to Defendant ASB or its successors in interest, to obtain credit on Plaintiffs' behalf, to not charge any fees which are not related to the settlement of the loan, and to disclose to Plaintiffs that the loan products together would provide a 30-year mortgage designed specifically with Plaintiffs known personal financial information required by Defendant ASB.

**248.** Defendant ASB, failed and refused, and continues to fail and refuse to honor the warranties set forth above.

**249.** Defendant ASB cannot, in good conscience and equity, retain the benefits from their actions of charging a higher

interest rate, fees, rebates, kickbacks, profits and gains from any resale of mortgages and notes using Plaintiffs' identities, credit scores, incomes, appraisal and reputations without consent, right, justification or excuse as part of an illegal enterprise scheme.

250. Defendant ASB has been unjustly enriched at the expense of Plaintiffs Fitzgerald and Parsons and maintenance of the enrichment would be contrary to the rules and principles of equity. Plaintiffs thus demand restitution from Defendant ASB in the form of actual damages to be proven at the trial on this matter.

**CLAIM VII**

**<u>SLANDER OF TITLE</u>**

(Against Defendants ASB, MERScorp, MERS and DOES 1-20)

251. The allegations contained in the preceding paragraphs of this Complaint are incorporated herein by reference.

252. Historically, a note and mortgage generally are inseparable. Every time a loan secured by a mortgage was sold, the assignee was required to publicly record the assignment to protect its security interest. The MERS system caused this traditional system to be radically altered. While the promissory notes may be transferred many times between multiple MERS members, the mortgage remains held by MERS as "mortgagee of record." The very operation of the MERS system results in the

promissory note and mortgage being split. Plaintiffs submit that MERS is not a party to the Promissory Note underlying the Mortgage and has no authority to take any action with respect to the Note.

**253.** In essence, the case for enforcement of a MERS loans is arguably worse, since MERS is never identified on the promissory note and is a *different* party than the actual economically interested business.

**254.** Plaintiffs submit that the Mortgage does not define or grant legal authority to MERS to assign a valid and enforceable interest in the Subject Mortgage minus the note; therefore, a MERS assignment would be questionable and quite possibly fraudulent and/or void.

**255.** Plaintiffs further submit that the presence of MERS as mortgagee creates an ambiguous contract that may or may not give it legal authority to assign the Mortgage and/or Note and because of this bifurcation of the mortgage loan documents the question arises that ASB is not a bona fide holder of a valid security interest in the Property, and MERS' Notice of Intent to Foreclose, dated December 15, 2010 and June 15, 2011, are void.

**256.** The recording of the ambiguous mortgage document by MERS, as mortgagee and nominee for ASB directly impairs the vendibility of the property on the open market in an amount to be determined at trial.

**257.** Society needs an authoritative, transparent source of information on who owns land in order to protect property rights, encourage commerce, expose fraud, and avoid disputes. Recent case law is beginning to show gathering judicial skepticism regarding the privatized record keeping system that is displacing public county systems.

**258.** That MERS maintains a database of servicing rights simply does not provide a commercially reliable, authoritative source of lien information because servicers, who are in business to make profit through providing financial services, do not have an incentive to maintain permanent, transparent, publicly available records of mortgage ownership.

**259.** MERS also does not systematically track beneficial ownership rights of the mortgages registered on its system. MERS only maintains a database which its members can enter information upon if they want to.[35] Thus, "MERS the Mortgagee" becomes more of a hiding place than a tracking device.

---

[35]    Even more troubling, MERS members are not legally bound to update this information on the database. In the words of the MERS' CEO, the system "is capable of being used to track [beneficial ownership interests] if the members utilize it for that reason." But, if the MERS members choose not to use the database to reveal themselves, MERS does not investigate further or otherwise insist that members actually use this feature of the database. Deposition of former MERS CEO R. K. Arnold, Henderson v. MERSCORP, INC., et al., CV-08-900805.00, Circuit Court for Montgomery County Alabama, September 25, 2009, at 176 (hereinafter: Arnold Deposition)

**260.** The recording of the mortgage and foreclosure documents made it necessary for Plaintiffs Fitzgerald and Parsons to retain legal counsel and bring this action to cancel the instrument, casting doubt on Plaintiffs' title.  Therefore, Plaintiffs are entitled to attorney's fees and costs incurred in cancelling the instrument.  The exact amount of such damages is not known to Plaintiffs at this time, and Plaintiffs will move to amend this Complaint to state such amount when the same becomes known.

**261.** The aforementioned record was motivated by fraud and malice, in that Defendants ASB and MERS knew or should have known that bifurcation of the mortgage and the note invalidates the transaction; and virtually make the documents unenforceable, because MERS has no written authority to assign any such documents although it shares position with interest in the mortgage contrary to the intent of the Promissory Note.  Such action warrants a declaratory judgment of clear title to the Plaintiffs and an award of exemplary damages in an amount to be determined at time of trial.

CLAIM VIII

INJUNCTIVE RELIEF

(Against Defendant ASB, MERScorp and MERS)

**262.** The allegations contained in the preceding paragraphs

http://www.scribd.com/doc/43093118/September-25-2009-Deposition-of-R-K-Arnold-MERSCORP (last visited 3/16/11)

of this Complaint are incorporated herein by reference.

**263.** Plaintiffs Fitzgerald and Parsons upon information and belief that the Defendants conspired to conduct non-judicial foreclosure sales of the Subject Property.

**264.** Plaintiffs Fitzgerald and Parsons have alleged facts that demonstrate a likelihood that Plaintiffs will succeed on the merits of their claims set forth in this Complaint.

**265.** Plaintiffs Fitzgerald and Parsons further allege that should either of the Defendants follow through with its stated intention to foreclose upon the Subject Property, that Plaintiffs will suffer irreparable harm, including, but not limited to the loss of the use of the Subject Property, and loss of their right to exclude others from entering, making use of, or removing things of value from the Subject Property.

**266.** Plaintiffs Fitzgerald and Parsons further allege that the balance of hardships between the Defendants and them falls firmly and unequivocally in their favor, in that Plaintiffs depend on the Subject Property as their home, while the Defendants are large business organizations with ample assets upon which to depend, and no interest in the Subject Property beyond selling it to a third party.

**267.** Plaintiffs Fitzgerald and Parsons, therefore, seek an order from the Court enjoining Defendants ASB and MERS from conducting the sale of the Subject Property pursuant to any

alleged power of sale, pending the resolution of this action,
whether by judgment of the Court or mutually agreed settlement
made between all parties to this action.

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Fitzgerald and Parsons demand
Judgment against Defendants, as follows:

(a)   For an order enjoining Defendants ASB and MERS from
foreclosing upon the Subject Property pursuant to any
alleged power of sale, pending the resolution of this
action, whether by judgment of the Court or mutually
agreed settlement made between all of the parties to
this action;

(b)   For a declaratory judgment of Quiet Title for the
Plaintiffs;

(c)   For a judgment awarding statutory damages in such
amounts as shall be established at the time of trial;

(d)   For a judgment awarding treble damages according to
proof;

(e)   For a judgment awarding exemplary damages in such
amounts as shall be proven at the time of trial;

(f)   For a judgment awarding reasonable attorney's fees
according to proof;

(g)   For a judgment awarding compensatory damages in such
amounts as shall be proven at time of trial;

(h)   For costs of suit incurred; and

(i)   For such other relief as the Court deems just and
      equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs Fitzgerald and Parsons, and each of them, hereby

demand trial by jury on all issues triable by right to a jury.

Dated March 23, 2011, at Wailuku, Hawaii.

IVEY FOSBINDER FOSBINDER LLLC
A LIMITED LIABILITY LAW COMPANY

_____

JAMES H. FOSBINDER
*Attorney for Plaintiffs*